UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - :
JAMIE LAMONT JONES,                     :

            Petitioner,                 :   07 Civ. 6587 (LAP)(JCF)
                                        :
        -against-                       :   REPORT AND
                                        :   RECOMMENDATION
THOMAS POOLE,                           :
                                        :
            Respondent.                 :
- - - - - - - - - - - - - - - - - - - - :
TO THE HONORABLE LORETTA A. PRESKA, U.S.D.J.:

        Jamie Lamont Jones, proceeding pro se, brings this petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254,

challenging his conviction in New York State Supreme Court, New

York County, for assault and criminal possession of a weapon. Mr.

Jones challenges his conviction on the grounds that: (1) the trial

court's instructions to the jury regarding burden of proof violated

his right to due process; (2) the court's instructions on

accessorial liability were confusing and biased; (3) he was denied

a fair trial when the trial court refused to deliver a jury charge

on justification; and (4) he was denied the effective assistance of

counsel. For the reasons set forth below, I recommend that the

petition be granted.

Background

    A. The Crime

    On December 12, 2001, Eliphelety Gonzaga and Michael Leslie

were walking along 112th Street in Manhattan on their way to a

grocery store.  (Tr. at 328-29, 356, 394-95).[1]  Mr. Leslie and Mr. Gonzaga lived in the same building and had known each other for sixteen years -- Mr. Leslie's older brother was a friend of Mr. Gonzaga's.  (Tr. at 328-29, 402).  They were both part of a group called the "Rat Pack," which Mr. Gonzaga described as "a group of singers and rappers and dancers."  (Tr. at 379-80).[2]

Two days earlier, on December 10, Mr. Leslie had gotten into a fistfight with Henry McCall, another resident of the same housing project, when Mr. McCall tried to steal Mr. Leslie's necklace.  (Tr. at 399-400, 410).  Mr. McCall left after the fight, but returned later with a gun and shot at Mr. Leslie, grazing his neck with the bullet.  (Tr. at 400).  Mr. Gonzaga had been with Mr. Leslie during the shooting.  (Tr. at 401).  As Mr. Gonzaga and Mr. Leslie were walking to the grocery store on December 12, Mr. Leslie stopped to tie his shoe and to talk to a friend while Mr. Gonzaga proceeded alone to the corner of 112th Street and First Avenue. (Tr. at 394-95).  According to Mr. Gonzaga, he was approached at the corner by Mr. McCall and four other men -- the petitioner and three men identified as Baseem, Moe, and Ishmael.[3]  (Tr. at 329-

---

[1] "Tr." refers to the transcript of the petitioner's trial.

[2] Mr. Leslie denied being a member of the Rat Pack.  (Tr. at 403).

[3] Both Mr. Gonzaga and Mr. Leslie knew the petitioner quite well, having seen him around the housing project "just about every day" for two years prior to the shooting.  (Tr. at 325, 393).  Mr. Gonzaga and Mr. Leslie often saw him in the company of Mr. McCall

30, 353). These men formed a "half circle" blocking Mr. Gonzaga's path, then pulled out guns, aimed at Mr. Gonzaga and began shooting. (Tr. at 330-32, 339-40, 353-55). According to Mr. Gonzaga, Mr. McCall, Baseem, and Mr. Jones all had guns; however, Baseem tripped and fell before he fired a shot, though his gun discharged when it hit the ground. (Tr. at 330-33, 338). Mr. Gonzaga claimed that he himself was unarmed, and in fact that he had "never touched a gun in [his] life." (Tr. at 381). Several shots were fired, one of which hit Mr. Gonzaga in the head, rendering him blind in the left eye. (Tr. at 332-34, 396). Another shot apparently hit a bystander, Angela Gutierrez, in the left ankle. (Tr. at 449-53, 453).[4]

Mr. Leslie claimed to have arrived shortly after the shots were fired, at which point he saw Mr. Jones standing very close to Mr. Gonzaga and then running away down First Avenue "reaching back into his jeans" as if "putting something in or taking something out." (Tr. at 395-96, 398-99). Mr. Leslie did not see anyone fire a shot and did not see who had a gun. (Tr. at 395-96).

Two police officers on patrol at First Avenue and 115th Street heard shots fired and drove to the corner of 112th Street. There,

---

and several others, including Baseem, Moe (also known as "Manny"), and Ishmael (also called "Macho"). (Tr. at 325-26, 393, 400-401).

[4] No evidence was introduced at trial that directly linked Ms. Gutierrez's injury with the shots fired at the corner of 112th Street and First Avenue.

they found a "chaotic" scene with officers and civilians gathered around Ms. Gutierrez, who had been taken to a parked van. (Tr. at 448-50). The officers moved Ms. Gutierrez to their car and drove her to the hospital without further surveying the scene. (Tr. at 450-51). Another officer, Detective John Gisonno, received a call and drove to the scene. (Tr. at 480-81). Upon seeing many other officers already there, he proceeded to Mr. Gonzaga's building and found him slumped in the hallway outside his apartment, bleeding from the head. (Tr. at 481-82, 501-02). Medical personnel arrived and took Mr. Gonzaga to the hospital. (Tr. at 482, 484). No weapons were found on Mr. Gonzaga or at the scene of the crime. (Tr. at 482-86).

The one other witness to the shooting told a story quite different from Mr. Gonzaga's and Mr. Leslie's. Angela Lacayo was a home health attendant to Ms. Gutierrez, who on the day of the shooting was accompanying Ms. Gutierrez down First Avenue toward 112th Street. (Tr. at 554-55). Ms. Lacayo testified that she saw a tall, thin Latino man walking east on 112th Street toward First Avenue and two tall, skinny black men walking up First Avenue toward 112th Street. (Tr. at 555-56, 563-64).[5] These three men, and only these three, converged at the corner. (Tr. at 556, 579-

---

[5] Mr. Gonzaga's medical records indicate that he is 6 feet tall. (Brief for the Defendant-Appellant ("Pet. App. Br."), attached as Exh. A to Declaration of Jodi A. Danzig dated Dec. 28, 2007 ("Danzig Decl."), at 10). The petitioner's rap sheet shows that he is 5 feet 4 inches tall. (Pet. App. Br. at 10).

80).  She then saw the Latino man "lift up his shirt" and pull out a gun.  (Tr. at 556).  One of the two black men also pulled out a gun, and he and the Latino man began shooting at each other.  (Tr. at 556-68).  The two backed away from each other while exchanging gunfire and then fled in opposite directions. (Tr. at 564-65).  She did not see whether either man was injured.  (Tr. at 587-88).  Ms. Lacayo testified that the events unfolded "quickly" and that just after the shooting started, Ms. Gutierrez fell down with her leg bleeding, though Ms. Lacayo did not see how Ms. Gutierrez got shot. (Tr. at 559-60, 585-87).  At trial, Ms. Lacayo did not identify the petitioner as one of the men she saw in the shootout.  (Tr. at 589).  She also testified that she did not see whether the second black man had a gun.  (Tr. at 556).

B. <u>The Trial</u>

A jury trial commenced on January 14, 2003 before Justice Edward McLaughlin.  Neither the petitioner nor Mr. McCall testified at the trial.  However, a statement that the petitioner gave to Detective Gisonno after his arrest was read into the record.  (Tr. at 490-91, 493-94).  In that statement, the petitioner claimed to have been in the vicinity of the shooting, to have seen a number of people including Mr. McCall arguing on the corner, and to have left the scene when he heard shots fired.  (Tr. at 494).  He also testified before the grand jury, and this testimony was introduced at trial.  (Tr. at 507-36).  The petitioner's grand jury testimony

mirrored the statement that he gave to police, except that in the grand jury he identified Mr. Gonzaga and another man known as "Black" as two of the men arguing on the corner with Mr. McCall. (Tr. at 513-14). He also said that a Latino or light-skinned black man was one of the men who fired at Mr. Gonzaga. (Tr. at 518-32). He claimed not to have seen a weapon or to have seen anyone else fire shots. (Tr. at 531).

At the close of the testimony, defense counsel requested that the court instruct the jury on justification. Judge McLaughlin refused on the basis that a justification charge would be inconsistent with the versions of events presented by both the prosecution and the defense. (Tr. at 626-27). The defense renewed its request for a justification charge after summation and again after the court delivered its instructions to the jury; Justice McLaughlin denied the application each time. (Tr. at 711, 773).

### 1. The Burden of Proof Charge

Following summations, the court charged the jury. In describing the burden of proof, the judge gave the following instructions:

> As you find facts, any defendant is entitled to all the factual inferences in his favor which can reasonably be drawn from the evidence, and where two factual inferences may be drawn from the evidence, both factual inferences being the People's weight and strength, one factual inference consistent with guilt and the other factual inference consistent with innocence, any defendant is entitled to the inference of innocence.

(Tr. at 715-16). The court went on to instruct the jury that,

6

When a jury finds a fact, it has to be done fifty-one to
forty-nine.  When a jury finds that the People have
failed to or have met an element, that's beyond a
reasonable doubt, that's where the standard beyond a
reasonable doubt is applied.  It's on the elements, not
the individual fact-finding, because in a case, it is a
mosaic.  You figure out what pieces go into the puzzle.
It is the prosecution's obligation to put things in the
case that you can use to decide whether a fact exists
directly by inference is fifty-one/forty-nine.  The
elements, however, must be proven beyond a reasonable
doubt.

(Tr. at 716-17).  Toward the end of his charge, Justice McLaughlin

invoked a preponderance of the evidence standard for the burden of

proof again, stating,

The pool from which jurors come is the  same pool from
which the electorate comes.  And in elections, there are
close counts.  In elections, fifty one point one beats forty-
nine point nine every time, and even if the person is a
loser, they're a winner and you're stuck with them for
two or six years and in the case of some judicial
elections, fourteen long years.

For over two hundred and thirty years, the same pool of
people that has never elected anybody by acclamation
[sic] has been deciding unanimously criminal cases.  How
does that happen?  It happens, obviously, because during
the course of deliberations, people change their minds.

(Tr. at 752-53).  After the charge, the defense objected on the

ground that, among other things, the court's repeated invocation of

the 51 to 49 standard "was confusing to the jury and [] may, in

fact [] act to lessen the burden of proof on this case."  (Tr. at

773).

During the jury's deliberations, it sent a note to the court

asking for "a statement of how certain a juror must be of a finding

7

of fact on which guilt or innocence crucially depends." (Tr. at 788). The court proposed to re-instruct the jury that a "fact is fifty-one/forty-nine, the verdict and the elements, has [sic] to be beyond a reasonable doubt." (Tr. at 789). However, defense counsel argued that if "[i]t's a fact, it's beyond a reasonable doubt. I don't think it's fifty-one/forty-nine." (Tr. at 789). Justice McLaughlin ultimately instructed the jurors that,

> Because the People must prove elements of a crime beyond a reasonable doubt, it follows that if a fact is crucial, on guilt or non-guilt, then such a fact on which proof beyond a reasonable doubt hinges, would have to be established beyond a reasonable doubt before a juror could be satisfied that an element was proven to that standard.
>
> Not every fact in a case must be proven beyond a reasonable doubt, but if a fact's existence is indeed critical or necessary to establish an element necessary for a guilty verdict, then that fact must be proven beyond a reasonable doubt.
>
> Jurors may arrive at their individual verdicts differently, but if a fact's existence is so critical that no reasonable person could find guilt beyond a reasonable doubt without that fact, then it must be established beyond a reasonable doubt, for example, identity.

(Tr. at 792).

### 2. The Acting in Concert Charge

The court also instructed the jury on the concept of accomplice liability. Justice McLaughlin began by stating, "In order for the People to rely on this in concert or joint responsibility theory, they have to prove two things beyond a reasonable doubt. They have to prove, as I said, that any

8

participant . . . ha[s] the same mental elements" as under the applicable criminal statute.  (Tr. at 726-27). The court provided two hypothetical examples to illustrate the mutual intent requirement.  The first involved a gunfight similar to the one in the case at trial.  In that scenario, the court said, "If a person has the mental element to cause injury to the person at whom the gun is pointed, even if they don't have a gun, even if they had a gun and fired and missed, . . . the one who fired and missed or the one who threatened with a gun but didn't fire" would be just as guilty as the one who  committed the shooting, provided they "ha[d] a common goal." (Tr. at 727).  The second hypothetical involved a burglary where one person entered a warehouse and stole merchandise, a second person did not enter the warehouse but helped carry the stolen property, and a third person drove the get-away vehicle.  (Tr. at 727-28).  In such a situation, the court said, "everybody knows what's going on."  (Tr. at 727).  Therefore, "[a]ll three of them are guilty of the burglary.  The one in the car is as guilty as if he or she went into the warehouse" or had carried away the property.  (Tr. at 728).

To illustrate the participatory act requirement, Justice McLaughlin then used the example of an orchestra.  During the performance, the conductor is "participating throughout" by "waving a baton." (Tr. at 729-30).  Likewise, various musicians "do things at different times."  For each member of the orchestra, "their

brief moment is as much part of the performance as anybody who's performed during that event . . . . The degree doesn't matter." (Tr. at 730). Finally, the court likened accomplice liability to pregnancy, explaining, "You are either in it or not. . . . You are either a little involved or you are not involved. You are either a lot involved or you're not involved. Percentages don't matter." (Tr. at 730).

During its deliberations, the jury sent a note requesting "[a] statement of the elements of a crime carried out 'in concert,' in particular, the definition of an 'action' by the defendant guilty of acting in concert even if he is not a shooter." (Tr. at 773). Commenting that the jurors "seem to want something on the intent to assist part of the acting in concert concept" (Tr. at 774), Justice McLaughlin proposed giving another hypothetical where one person in one state solicits another person in a second state to commit a murder. (Tr. at 776). Both the prosecution and the defense objected to the hypothetical and requested that the court refrain from giving additional hypotheticals, and stick to the New York Criminal Jury Instructions ("CJI") instead. (Tr. at 777-78). Justice McLaughlin refused, telling the parties that he was not "merely going to give [the] law," as that would not be a "meaningful" response to the jury's question. (Tr. at 778).

When the jury came in, the judge restated the law on accessorial liability. He emphasized that each actor had to share

10

a "common purpose" and the required "mental state." (Tr. at 780).
Neither mere presence nor mere association with other actors could
form the basis of accomplice liability. (Tr. at 781-82). Justice
McLaughlin then offered two more examples to address the jury's
"very specific question about what can a non-shooter do if he's
guilty of in concert participation in a crime like this." (Tr. at
783). The first involved a hypothetical murder in a hallway where
"one person . . . is standing behind the door peeking out, he sees
the victim come onto the hallway and says, 'He's here,' and then
somebody else . . . steps into the hallway and shoots him, a jury
could find that the identifier, the observer is in concert, but is
not a shooter." (Tr. at 783).

The second hypothetical (and fifth overall) involved a two-
state murder. In this scenario,

> if a person in California wants somebody in New Hampshire
> killed and makes arrangements to pay the person in New
> Hampshire and pays the person, maybe even sends a gun or
> sends him money to buy a gun, a jury can decide that the
> person who never leaves California, who never touches a
> gun, who [n]ever fires a gun, who never sees the victim
> of the shooting, is in concert with the shooter in New
> Hampshire.

(Tr. at 784). At the end, the court cautioned again that "[m]ere
presence does not count. You have to do something. Having a
common mental purpose." (Tr. at 784). After this charge, defense
counsel objected to the hypothetical, saying, "Just because someone
gives a glance, I don't think that's enough for acting in concert."
(Tr. at 785). Justice McLaughlin disagreed, but provided the jury

11

with the additional instruction that "an inadvertent act doesn't count. A glance or a nod of the head . . . intended to communicate information that furthers the common purpose" could support a finding of accessorial liability, but "an inadvertent twist or a no[d] or a shake of the head that's not done for [that] purpose" could not. (Tr. at 786-87).

On the third day of deliberations, the jury sent a note to the court requesting "a statement explaining whether accompanying a man to a confrontation, a man whom one knows to be armed and that uses the weapon, is sufficient to establish one's intent that the weapon be used for murder, assault or any other unlawful purpose." (Tr. at 797). Defense counsel argued that "the direct response to the question is no" since "accompanying someone who you know to be armed, unless you have the intent to use that arm is insufficient." (Tr. at 800). In response, Justice McLaughlin stated that "it seems to me that [the jury is] pre-supposing in their note, knowledge on the part of an unarmed person that the unarmed person is accompanying an armed person to a thwarted confrontation." (Tr. at 800). The judge then called the jurors back to the courtroom, telling them that "my answer will incorporate some of your words and phrases, which I presume is a presupposition or findings even." (Tr. at 805). He proceeded to instruct the jury as follows:

> You heard me say in the acting in concert explanation that mere presence is not sufficient, that the People have to prove beyond a reasonable doubt a mental element, intent, and the doing of something that assists. Your

word is "confrontation."  A confrontation with a weapon
is unlawful.  If the weapon is a loaded firearm, the type
of confrontation and the potential result becomes more
defined.

One who accompanies an armed man to a confrontation can
be found by a jury, if it chooses to do so, guilty of
being in concert with the one who physically possesses
and then uses the pistol for any unlawful purposes that
the user of the weapon employs during the confrontation.

Or on intent that I read on Tuesday, says that the jury,
if it chooses to do so, if it makes sense in the context
of whatever facts your folks are finding, the law on
intent says in part, as I explained on Tuesday, that a
jury can find that a person intends the normal, natural
and logical consequences of what their actions are and
what the actions are of those with whom they may be in
concert.

Intent, you know, is a secret operation of the mind and
you can look to what somebody did before, during and
after on what they intended.  In the context of this kind
of situation . . .  only if you decide that a person's
presence was for the purpose of in some way assisting can
the person be found liable for the in concert possession.

But this is a unique situation where presence could be
enough for the second element of the in concert, provided
a jury beyond a reasonable doubt decided that the
presence was for some purpose to assist the goal, the
common purpose.  It's any purpose and an assistance,
however great or small: being an alternate target; being
a pointer out, as that example I gave you yesterday or
the day before; being a distraction; anything.  But it
has to be done beyond a reasonable doubt, the presence of
a non-armed person at a confrontation with weapons or has
to be for purposes in some fashion, leading [sic].

(Tr. at 806-08).

Defense counsel objected to this supplemental charge, but the

court overruled the objection.  (Tr. at 810-11).

After deliberating for four days, the jury returned a verdict

finding Mr. Jones guilty of two counts of assault in the first

degree in violation of New York Penal Law ("Penal Law") § 120.10(3) and one count of criminal possession of a firearm in the second degree in violation of Penal Law § 265.03(2). (C. at 17-18; Danzig Decl., ¶ 1; Respondent's Memorandum of Law in Opposition to the Petition for a Writ of Habeas Corpus ("Resp. Memo.") at 12).[6] He was found not guilty of attempted murder and of two additional counts of assault in the first degree. (C. at 17; Resp. Memo at 12).

On March 10, 2003, Mr. Jones was sentenced as a second felony offender to two terms of imprisonment of 20 years for first degree assault and one 15-year term for criminal possession of a weapon in the second degree, with all sentences to run concurrently. (Danzig Decl., ¶ 1; Resp. Memo. at 12).

C. <u>Subsequent Proceedings</u>

Mr. Jones appealed his conviction to the Appellate Division, First Department, on the same three grounds concerning the jury charge that are the basis for his present petition as well as on the ground that the verdict was against the weight of evidence. (Pet. App. Br.). His conviction was unanimously affirmed on June 16, 2005. <u>People v. Jones</u>, 19 A.D.3d 220, 797 N.Y.S.2d 63 (1st Dep't 2005).

The Appellate Division found first that a justification

---

[6] "C." refers to the separately paginated portion of the proceedings appended at the end of the trial transcript, which is characterized as "colloquy."

instruction was not necessary because "no reasonable view of the evidence supported [such a] defense." Id. at 220, 797 N.Y.S.2d at 64. In addition, the court concluded that Justice McLaughlin's instructions to the jury did not warrant reversal because "[a]lthough some of the language employed by the court was disapproved by us . . . in this case there was no prejudice to defendant, insofar as the court made it clear . . . that defendant was entitled to all reasonable factual inferences and the People had the burden of proving every essential element beyond a reasonable doubt." Id. at 220, 797 N.Y.S.2d at 64.

Leave to appeal to the New York Court of Appeals was denied on August 25, 2005. People v. Jones, 5 N.Y.3d 807, 803 N.Y.S.2d 36 (2005). Subsequently, the United States Supreme Court denied the petitioner's application for a writ of certiorari. Jones v. New York, 547 U.S. 1026 (2006).

On June 11, 2006, Mr. Jones filed a motion pursuant to New York Criminal Procedure Law ("CPL") § 440.10 in New York State Supreme Court seeking to vacate the judgment of conviction. In that motion, he claimed that trial counsel was ineffective because he (1) failed to request that the prosecutor deliver a justification charge to the grand jury, (2) failed to impeach the victim with a prior statement contained in a police report, and (3) failed to request a jury instruction based on CPL § 60.22 that the defendant could not be convicted upon the uncorroborated testimony

of an accomplice. (Notice of Motion and Affidavit in Support of Motion to Vacate the Judgment("440.10 Motion"), attached as Exh. H to Danzig Decl.). Justice McLaughlin denied the motion on September 28, 2006. (Decision on Motion to Vacate Judgement dated Sept. 28, 2006 ("440.10 Decision"), attached as Exh. J to Danzig Decl.). First, he found that counsel was not ineffective for failing to request that the jury be charged pursuant to CPL § 60.22 because "[n]o reasonable view of the evidence supports the conclusion that the [] victim was an accomplice" of the petitioner. (440.10 Decision at 1). He also found that nothing in the record gave defense counsel reason to believe that a justification defense should have been presented to the grand jury, since the defendant testified to the grand jury that he was an innocent bystander not involved in the shooting. (440.10 Decision at 2). Finally, Justice McLaughlin found that counsel was not ineffective for failing to use the police report to impeach Mr. Gonzaga, since the individual giving the report admitted that she was not "really sure" of what had been said and because the statement was not in fact inconsistent with Mr. Gonzaga's testimony nor with the petitioner's guilt. (440.10 Decision at 2). On February 7, 2007, the Appellate Division denied the petitioner's application for leave to appeal the Supreme Court's decision. People v. Jones, M-6217, 2007 N.Y. App. Div. LEXIS 1823 (1st Dep't Feb. 7, 2007).

Mr. Jones filed the instant petition on June 22, 2007. The

16

respondent concedes that the petition is timely and opposes it on the merits.

Discussion

    A.  AEDPA Standard

Prior to passage of the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), P.L. No. 104-132, 110 Stat. 1214 (1996) federal courts were not required to defer to state court determinations of law or of mixed questions of law and fact when considering habeas petitions. See Thompson v. Keohane, 516 U.S. 99, 107-12 (1995); Brown v. Artuz, 283 F.3d 492, 497 (2d Cir. 2002). Under the AEDPA, however, a federal court may only grant a writ of habeas corpus to a state prisoner where the state court adjudicated the claim on the merits and where that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Pursuant to the "contrary to" clause, a federal habeas court may grant the writ "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, "a federal

habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

Congress used the term "unreasonable" to modify "application." 28 U.S.C. 2254(d)(1); see Williams, 529 U.S. at 411.  Thus, it follows that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams, 529 U.S. at 411.  Furthermore, the petitioner need not show that all reasonable jurists would agree that a state court determination is incorrect in order for it to be unreasonable. Id. at 409-12.  Instead, a federal court should review a state court's interpretation of federal law using a standard of objective reasonableness. Id. at 409-10.  The "'increment of incorrectness beyond error . . . need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Yung v. Walker, 341 F.3d 104, 109-10 (2d Cir. 2003) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000).

Deference need only be applied to claims adjudicated on the merits by the state court.  If the state court did not adjudicate the claim on the merits, a federal court may review the claim de

novo.  Here, there is no dispute that the state appellate court reviewed the petitioner's claims and disposed of them on the merits; thus, the standard of review set forth in the AEDPA applies.

　　　　B.  Jury Charge Challenges

In order to prevail on a claim for habeas corpus relief based on an erroneous jury instruction, the petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147 (1973). Where due process has not been violated, "instructions that contain errors of state law may not form the basis for federal habeas relief." Gilmore v. Taylor, 508 U.S. 333, 342 (1993).  Jury instructions in state trials are a matter of state law, and "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Thus, the task of the habeas court is not to determine whether a given instruction was correct or incorrect under state law, but rather whether, in the context of the trial as a whole, the instruction violated the petitioner's constitutional right to due process.  See Boyd v. Babble, No. 95 Civ. 7862, 1999 WL 138927, at *4 (S.D.N.Y. March 15, 1999); Greenwood v. Keane, No. 90 Civ. 0444, 1992 WL 116360, at *4 (S.D.N.Y. May 20, 1992).

The federal court must consider the instruction in the context of the whole jury charge.  Estelle, 502 U.S. at 72; Smalls v.

19

<u>Batista</u>, 191 F.3d 272, 277 (2d Cir. 1999).  The reviewing court's task is not to determine "whether the challenged instructions, standing alone, are erroneous or misleading," <u>Beverly v. Walker</u>, 118 F.3d 900, 902 (2d Cir. 1997), but rather "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." <u>Estelle</u>, 502 U.S. at 72 (internal quotation marks and citation omitted).

      1.  <u>Burden of Proof Charge</u>

Mr. Jones' first claim concerns a number of statements made by the court that he claims may have confused the jury as to the burden of proof.  First, Justice McLaughlin gave a so-called "two inference" charge, in which he told the jury that "where two factual inferences may be drawn from the evidence, both factual inferences being the People's weight and strength, one factual inference consistent with guilt and the other factual inference consistent with innocence, any defendant is entitled to the inference of innocence."  (Tr. at 715-16).  Second, Justice McLaughlin instructed the jury that there was a separate burden of proof for fact-finding, and that "when a jury finds a fact, it has to be done fifty-one to forty-nine." (Tr. at 716-17).  Later, when encouraging the jury to keep an open mind and reach a unanimous verdict, the judge used the analogy of an election, where "fifty-one point one beats forty-nine point nine every time.  (Tr. at 752).  Furthermore, in a supplemental instruction in response to a

note from the jury, the judge again stated that "[n]ot every fact in a case must be proven beyond a reasonable doubt." (Tr. at 792). The petitioner contends that these instructions led the jury to believe that it could find petitioner guilty by a preponderance of the evidence rather than beyond a reasonable doubt.

Due process requires that the prosecution bear the burden of proof beyond a reasonable doubt for every essential element of a crime. Francis v. Franklin, 471 U.S. 307, 313 (1985). "[T]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." Victor v. Nebraska, 511 U.S. 1, 5 (1994) (internal quotation marks and citations omitted). However, a jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden . . . . is plainly inconsistent with the constitutionally rooted presumption of innocence." Cool v. United States, 409 U.S. 100, 104 (1972). Accordingly, the Supreme Court has reversed convictions where the trial judge issued misleading instructions on reasonable doubt. See Cage v. Louisiana, 498 U.S. 39, 41 (1990) (per curiam) (reversing where charge "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,'" thereby suggesting to the jury "a higher degree of doubt than is required for acquittal under the reasonable-doubt standard"), overruled on other

21

grounds, <u>Estelle</u>, 502 U.S. at 72 n.4.

"[W]hen a trial court attempts to explain 'reasonable doubt' for a jury, reviewing courts must scrutinize the instructions to ensure that the defendant was not judged by a lesser standard than 'proof beyond a reasonable doubt.'" <u>Chalmers v. Mitchell</u>, 73 F.3d 1262, 1266-67 (2d Cir. 1996). A reasonable doubt instruction is constitutionally deficient if it gives rise to a "'reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the standard'" of "'proof beyond a reasonable doubt of every fact necessary to constitute the crime . . . is charged.'" <u>Gaines v. Kelly</u>, 202 F.3d 598, 602, 605 (2d Cir. 2000) (quoting <u>Victor</u>, 511 U.S. at 6, and <u>In re Winship</u>, 397 U.S. 358, 364 (1970)); <u>accord</u> <u>United States v. Birbal</u>, 62 F.3d 456, 462 (2d Cir. 1995). In making this determination, a reviewing court should assess the challenged portions of the jury charge "not 'in artificial isolation,' but rather 'in the context of the overall charge.'" <u>Justice v. Hoke</u>, 45 F.3d 33, 34 (2d Cir. 1995) (quoting <u>Cupp</u>, 414 U.S. at 146-47).

Interpreting these precedents, courts have spoken directly on the language used by Justice McLaughlin to describe the burden of proof. First, the "two inference" charge used by the court has been consistently held to be improper by both state and federal courts. In <u>United States v. Inserra</u>, the Second Circuit affirmed its position on this instruction, stating that "[w]e repeatedly

22

have emphasized that [the 'two inference'] charge is improper because it 'may mislead a jury into thinking that the government's burden is somehow less than proof beyond a reasonable doubt.'" 34 F.3d 83, 91 (2d Cir. 1994) (quoting United States v. Khan, 821 F.2d 90, 93 (2d Cir. 1987), and proceeding to find that the judge's charge as a whole "properly conveyed the concept of reasonable doubt to the jury"); see also United States v. Attanasio, 870 F.2d 809, 818 (2d Cir. 1989)(same); People v. Fields, 87 N.Y.2d 821, 823, 637 N.Y.S.2d 355, 357 (1995) (determining that a variation on the two inference charge was "improper and should not have been used," but affirming conviction in light of "the court's extensive, accurate instructions on the burden of proof" (emphasis omitted)); Trinidad v. Senkowski, 90 Civ. 6110, 1991 WL 60418, at *4 (S.D.N.Y. April 11, 1991); People v. Durden, 211 A.D.2d 568, 569, 621 N.Y.S.2d 611, 612 (1st Dep't 1995) (noting that use of "'two inferences' charge language'" was "disfavored" but concluding that "the charge viewed as a whole conveyed the appropriate burden of proof").

Second, the Second Circuit has made it "completely clear that district judges should not charge that 'separate bits of evidence' need not be proved beyond a reasonable doubt" as the court did here. See United States v. Delibac, 925 F.2d 610, 616 (2d Cir. 1991) (instruction "confusing" and "unnecessary"); United States v. Viafara-Rodriquez, 729 F.2d 912, 913 (2d Cir. 1984) (finding

instruction "not helpful").    Indeed, the Second Circuit has repeatedly cautioned that trial judges "would be exceedingly well advised to use [the model instruction on reasonable doubt] rather than improvise variations upon it." <u>United States v. Ivic</u>, 700 F.2d 51, 69 (2d Cir. 1983), <u>abrogated on other grounds by</u> <u>National Organization for Women, Inc. v. Scheidler</u>, 510 U.S. 249 (1994); <u>accord</u> <u>United States v. Gatzonis</u>, 805 F.2d 72, 74 (2d Cir. 1986); <u>Viafara-Rodriguez</u>, 729 F.2d at 913-14.    In using both of these improper instructions, then, Justice McLaughlin's charge clearly ran a substantial risk of confusing the jury as to the burden of proof.

The respondent argues that even if the complained-of instructions were "inappropriate," the court's jury charge as a whole properly conveyed the standard of proof.    (Resp. Memo. at 20).    The respondent points out that shortly after giving the two-inferences instruction, the judge reminded the jury that "[t]he elements have to be proven beyond a reasonable doubt."    (Tr. at 717).    Later, the judge gave additional instructions on the prosecution's burden of proof, emphasizing that the law "places the burden entirely on the People" and that the it remains there "continually and perpetually."    (Tr. at 722).    He defined reasonable doubt as "a doubt you are conscious of having after reviewing in your mind all of the evidence," and he instructed the jurors that if they "feel uncertain or are not fully convinced that

24

[the] defendant is guilty . . . the defendant would be entitled to a verdict of not guilty." (Tr. at 723). Finally, in response to a note from the jury requesting clarification about the burden of proof, the judge gave a supplemental instruction in which he stated that though "[n]ot every fact in a case must be proven beyond a reasonable doubt, [] if a fact's existence is indeed critical or necessary to establish an element necessary for a guilty verdict, then that fact must be proven beyond a reasonable doubt." (Tr. at 792). The respondent also points out that while the Second Circuit has repeatedly found the "two inference" language to be improper and confusing, it has declined to order a new trial on the grounds that the charges in their entirety fairly conveyed the proper burden of proof. (Resp. Memo. at 24); see Inserra, 34 F.3d at 91; Attanasio, 870 F.2d at 818; Khan, 821 F.2d at 92-93.

Those arguments are not persuasive here. First, the constitutionality of an otherwise improper instruction is not salvaged simply because the correct burden of proof was conveyed at some point during a jury charge. In Bloomer v. United States, the Second Circuit found a jury charge constitutionally deficient notwithstanding the trial court's having repeated the correct standard "at least 17" times. 162 F.3d 187, 194 (2d Cir. 1998) (noting that "the erroneous instruction was only partially ameliorated by the court's correct instruction several sentences earlier" (quoting United States v. Birbal, 62 F.3d 456, 460 (2d

25

Cir. 1995)).  Here, the correct standard was stated far less frequently.  Next, given that the challenged jury instructions must be viewed not in isolation but "in the context of the overall charge," Cupp, 414 U.S. at 146-47, it is important to consider that the court here did not merely use the improper two-inferences language.  Rather, the judge also invoked a 51-49 or preponderance of the evidence standard three times, including in his final address to the jury before deliberations and in his supplemental instructions.  See also Bollenbach v. United States, 326 U.S. 607, 612 (1946) ("[I]n a criminal trial, the judge's last word is apt to be the decisive word.  If it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge.").

The repeated muddling of the burden of proof, along with the confusing and potentially prejudicial accomplice liability instructions discussed below, distinguishes the petitioner's case from Khan.  In Khan, while the court found that "the 'two-inference' language should not be used because, standing alone, such language may mislead a jury into thinking that the government's burden is somehow less than proof beyond a reasonable doubt," it ultimately concluded that the "entire charge . . . fairly conveyed to the jury the concept of proof beyond a reasonable doubt."  821 F.2d at 92-93.  There, however, the two-

inference language was the only misleading instruction.[7]    In this
case, there were at least three additional improper or confusing
statements regarding the burden of proof.   The Second Circuit has
made clear that courts must consider the "cumulative error in
reasonable doubt instructions" to the constitutionality of a jury
charge.   <u>Gaines</u>, 202 F.3d at 607-08 ("cumulative effect of the
three errors" regarding definition of reasonable doubt "was to
obfuscate one of the essentials of due process and fair treatment"
(quoting <u>Dunn v. Perrin</u>, 570 F.2d 21, 25 (1st Cir. 1978)); <u>see also</u>

_____

[7] Similarly, in other cases where the court held that
invocation of a preponderance of the evidence standard was
insufficient to warrant reversal, the instructions in question
included only a single reference to the preponderance standard.
<u>See</u> <u>Hoke</u>, 45 F.3d 34-35; <u>Delibac</u>, 925 F.2d at 614; <u>Gatzonis</u> 805
F.2d at 74; <u>Viafara-Rodriguez</u>, 729 F.2d at 913-14.

    In some instances, even a single reference to a standard of
proof other than beyond a reasonable doubt has been sufficient to
reverse a conviction.  <u>See, e.g.</u>, <u>Callahan v. LeFevre</u>, 605 F.2d 70,
73 (2d Cir. 1979)(reversing denial of habeas petition where jury
instruction allowed conviction by a preponderance of the evidence
even though "[i]t is of course true that one erroneous instruction
often will not result in a deprivation of a defendant's
constitutional rights"); <u>People v. Young</u>, 236 A.D.2d 800, 800-01,
653 N.Y.S.2d 471, 472 (4th Dep't 1997) (reversing conviction where
instruction that "'it is possible to establish the guilt of a
defendant charged with a crime to a <u>reasonable degree of certainty</u>'
. . . effectively reduced the People's burden of proof, thereby
depriving defendant of a fair trial"); <u>People v. Myers</u>, 212 A.D.2d
1032, 1032, 623 N.Y.S.2d 48, 49 (4th Dep't 1995); <u>People v. Sneed</u>,
193 A.D.2d 1139, 1139-40, 598 N.Y.S.2d 624, 624-55 (4th Dep't 1993)
(reversing conviction where trial court "improperly instructed the
jury that 'it is possible to establish the guilt of a defendant
charged with a crime to a reasonable degree of certainty'"); <u>People
v. Hewlett</u>, 133 A.D.2d 417, 417-18, 519 N.Y.S.2d 555, 557 (2d Dep't
1987) (same);   <u>People v. Bailey</u>, 121 A.D.2d 189, 190-92, 503
N.Y.S.2d 16, 17-18 (1st Dep't 1986).

Chalmers, 73 F.3d at 1269 ("[A] combination of independently non-reversible errors that taken together lead the jury to convict under a standard less than that required by the Due Process Clause is grounds for overturning a conviction."); Birbal, 62 F.3d at 460 (instruction that jury "may acquit the defendant" if the prosecution failed to prove his guilt beyond a reasonable doubt, "when added to the already catalogued litany of errors, push[ed] the charge over the line"); see generally United States v. Morales, 577 F.2d 769, 777 (2d Cir. 1978) (jury charge misstatements had "cumulative effect" of confusing jury and depriving defendant of fair trial). Here, it is the cumulative effect of four improper or confusing references to the burden of proof that render this jury charge unconstitutional.

Indeed, it was the joint use of precisely these improper and confusing jury instructions that led the Appellate Division to reverse a conviction in a case presided over by Justice McLaughlin just a few months before Mr. Jones' trial. People v. Johnson, 11 A.D.3d 224, 783 N.Y.S.2d 5 (1st Dep't 2004).[8] In that case, the

---

[8] Justice McLauglin has also been admonished numerous times for his use of some the same jury instructions that are at issue here. See Johnson v. Poole, 02 Civ. 5349, 2003 WL 118505, at *3 (S.D.N.Y. Jan. 14, 2003) (criticizing Justice McLaughlin's use of the voting analogy as not "one that the Court would consider ideal"); Jones, 19 A.D.3d at 220, 797 N.Y.S.2d at 64; People v. Garcia, 15 A.D.3d 151, 152, 788 N.Y.S.2d 599, 599-600 (1st Dep't 2005) (noting that "some of the language employed by [Justice McLauglin] was disapproved," but affirming conviction where charge made it clear that "the People had the burden of proving every essential element beyond a reasonable doubt"); People v. Chisolm,

court employed three of the same four instructions complained of here:  what the Appellate Division called the "two-inference" charge, the "preponderance charge on fact finding," and the "unanimous verdict instruction."  <u>Johnson</u>, 11 A.D.3d at 224-27, 783 N.Y.S.2d at 6-9.[9]  The Appellate Division determined that the use

---

15 A.D.3d 154, 155, 789 N.Y.S.2d 21, 22 (1st Dep't 2005) (stating that "it would have been preferable for [Justice McLaughlin] to employ the Criminal Jury Instructions" though jury charge ultimately "conveyed the appropriate principles"); <u>People v. Cruz</u>, 172 A.D.2d 383, 383, 568 N.Y.S.2d 763, 764 (1st Dep't 1991) (stating that two-inference instruction "ha[d] been criticized as potentially confusing to the jury," but affirming conviction where Justice McLaughlin's "charge as a whole conveyed the appropriate burden of proof").

[9] The offending instructions in <u>Johnson</u> were almost identical to those in the instant case.  The "two-inference" charge instructed the jury that,

> [W]here two factual inferences can be drawn from the evidence, both being of equal weight and strength, one factual inference consistent with guilt and the other factual inference consistent with innocence, any defendant is entitled to the factual inference of innocence.

<u>Johnson</u>, 11 A.D.3d at 224, 783 N.Y.S.2d at 6.  The "preponderance charge on fact finding" asserted that,

> With regard to facts and with regard to the verdict, there are two different burdens of proof operating simultaneously . . . . With regard to finding of fact during the course of your deliberations, the burden of proof is simply that it is more likely than not that the fact exists, 50.1 beating 49.9.

<u>Id.</u> at 224, 783 N.Y.S.2d at 6-7 (alteration in original).  Finally, the "unanimous verdict" instruction stated,

> The two most important civic functions that citizens do are to vote and to serve on juries.  In voting in

of these instructions was "not merely potentially confusing [but] could undermine the jury's understanding of the presumption of innocence, the burden of proof and the standard of proof beyond a reasonable doubt," and "risk[ed] eliminating the reasonable doubt standard from the trial." Id. at 226, 783 N.Y.S.2d at 8. Indeed, with regard to the judge's use of the election example, the court noted that,

> [T]he last instruction the jurors heard before they began deliberating was a numerical expression of the simple majority in voting that echoed the numerical expression of the preponderance standard that the court had used earlier in explaining the burden of proof. This instruction could only have reinforced the court's improper instruction on the standard of proof.

Id. at 227, 783 N.Y.S.2d at 8-9.

In a concurring opinion, Justice Saxe addressed in more detail the reference to the preponderance standard in fact-finding, explaining that:

> [I]n the absence of a particular question, or some other unique circumstance making such an instruction important, giving this "subsidiary facts" charge in the context of the general closing charge to the jury is a pernicious practice, having no positive impact and being very likely

---

> elections, close counts, 50.1 beats 49.9 every time . . . The same group, citizens who can't elect anybody by acclamation, who elect some people 50.1 vote to 49.9, minus one vote, have for about two hundred thirty years rendered unanimous verdicts. How does that happen[?] . . . [Y]ou can change your opinion, your vote, provided based on reason, logic, common sense, and reliance on the record of this case if somebody can cause you to change your mind[.]

Id. at 226-27, 783 N.Y.S.2d at 8 (alterations in original).

to serve only to confuse the jury.

Moreover, even if we were to approve inclusion in a jury charge of a lesser burden of proof regarding "subsidiary facts," the language employed by the trial court here did not suffice to correctly convey the proper standard. Instead, the court, without explaining the distinction between "facts" and the "verdict," or even using the term "subsidiary facts," simply instructed that "[w]ith regard to facts and with regard to the verdict, there are two different burdens of proof operating simultaneously." This cannot be permitted to stand. We cannot allow a jury charge to refer to the use of the preponderance standard without an explanation of which types of facts may be proven by a preponderance of the evidence, and which, such as the actual commission of the act constituting the crime, must be proved beyond a reasonable doubt.

Id. at 229-30, 783 N.Y.S.2d at 10-11 (Saxe, J., concurring). Likewise, in the instant case Justice McLaughlin provided no guidance to the jury in initial charge for distinguishing between elemental facts and subsidiary facts, and while he did state later in response to the jury's note that a fact "critical or necessary" to establish guilt had to be proven beyond a reasonable doubt (Tr. at 792), this was not adequate to negate the harm caused by three unqualified references to the preponderance of the evidence standard. See Francis, 471 U.S. at 322 ("Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict."); Gaines, 202 F.3d at 608 ("[T]wo conflicting instructions," along with other deficiencies in the burden of proof charge, "must have

31

left the jury uncertain of the standard it was charged with applying. Such a jury, it goes without saying, was insufficiently prepared to carry out its constitutional mandate to resolve all reasonable doubts before adjudging the defendants guilty."(emphasis omitted) (quoting Birbal, 62 F.3d at 460)).

Though the Appellate Division distinguished Johnson when it upheld the petitioner's conviction, Jones, 19 A.D.3d at 220, 797 N.Y.S.2d at 64, it cited no satisfactory basis for doing so, nor is any apparent. Indeed, the instructions in this case were more problematic than those that led to reversal in Johnson; here, Justice McLaughlin included an additional iteration of the idea that "not every fact in a case must be proven beyond a reasonable doubt" (Tr. at 792), and confusing and prejudicial instructions with regard to accessorial liability, as described in detail below.[10]

This case is also different from Brown v. Greene, No. 06 Civ. 4824, 2007 WL 3286638 (S.D.N.Y. Nov. 6, 2007). In Brown, Justice

---

[10] The reversal in Johnson under similar circumstances, as well as the repeated admonitions of the Appellate Division in other cases where Justice McLaughlin used the same instructions, lends support to the conclusion that its decision not to reverse the petitioner's conviction in this case was unreasonable. See Gaines, 202 F.3d at 606-07 ("remarkable consistency and frequency in the state court's decision to reverse based on the same instructions, given by the same judge, we think supports our conclusion that the errors . . . [were] of a constitutional dimension"); accord Fong v. Poole, 522 F. Supp. 2d 642, 665-666 (S.D.N.Y. 2007) (granting habeas petition for coercive Allen charge in part due to Justice McLaughlin's having been "frequently admonished or reversed for unorthodox and incorrect jury instructions).

McLaughlin had issued two of the four jury instructions on burden of proof that the petitioner complains of here: the preponderance of the evidence charge for fact-finding and the unanimous verdict instruction.  In a "close question of law," the district court found that the jury instructions were less prejudicial than those reversed in Johnson, and that, despite the inclusion of language referencing a lesser burden of proof for factual findings, the instructions adequately described the burden of proof.  Id. at *5-7.  The error in this case, however, is more egregious than that in Brown for a number of reasons.

First, Justice McLaughlin used the two-inference charge in this case, rendering it more akin to Johnson than Brown.  In Brown, the court noted that "[c]ritically, the jury charge in this case did not include the two-inference instruction; this lessened the risk that the charge as a whole conveyed the improper standard."  Id. at *6.  Second, the jury charge in the instant case contained additional problematic language regarding accomplice liability not present in Brown.  As explained below, the confluence of the confusing accomplice liability charge and the burden of proof charge may have led the jury to believe that certain elements of the accomplice charge could be established by less than beyond a reasonable doubt.[11]  Third, the jury charge challenge in Brown was

---

[11] Certainly, the jury evinced confusion on that score, submitting at least four notes to the court asking for clarification regarding one of those two issues or the interaction between them.

framed as an ineffective assistance of counsel claim. Thus, the deference due to state court determinations under the AEDPA was further complemented by the deference afforded to the decisions of counsel under Strickland v. Washington, 466 U.S. 668 (1984), and the need to show prejudice as a result of counsel's conduct. Id. at 694. Finally, the evidence against the defendant in Brown was stronger than was the case here. In Brown, there were two witnesses who had implicated the defendant: the victim, who had no prior relationship with the accused, and a doorman. Here, by contrast, only one witness -- the victim, Mr. Gonzaga -- even placed the petitioner at the scene of the shooting, and that witness arguably had a motive for implicating the petitioner in the shooting because he had a close friend who had been involved in an altercation with an associate of the petitioner. In addition, it was adduced at trial that Mr. Gonzaga (as well as Mr. Leslie) was on probation for selling drugs at the time of the incident and would therefore have faced incarceration if he had been found to have possessed a weapon. (Tr. at 385-86, 408-10). Thus, he had a further motive to provide a version of events that involved multiple assailants rather than a scenario in which he and Mr. McCall were the ones exchanging gunfire.

Ultimately, while it is impossible to determine whether the jury "actually misunderstood its obligations under the presumption of innocence and the reasonable doubt standard . . . under [Supreme

Court precedent], we need not be sure.  We need only determine whether there is a reasonable likelihood, even if less than a probability, that the jury misunderstood these principles of law." United States v. Doyle, 130 F.3d 523, 539 (2d Cir. 1997)(citing Boyde v. California, 494 U.S. 370, 378-80 (1990) and Sullivan v. Louisiana, 508 U.S. 275, 278-82 (1993)); accord Estelle, 502 U.S. at 72; see also Chalmers, 73 F.3d at 1267 ("We cannot know what this jury did behind closed doors. The standard the jury applied can only be gleaned from examining what the jury was told."). Here, there is a reasonable likelihood that Justice McLaughlin's charge led the jury to misunderstand the burden of proof to be applied.

Of course, it is not enough for the state court to have incorrectly applied the "reasonable likelihood" standard elucidated in Boyde and Estelle.  Instead, to obtain a writ of habeas corpus under the AEDPA, the Appellate Division's decision must have been "contrary to, or involved an unreasonable application of" Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  The Supreme Court has noted that "the term 'unreasonable' is . . . difficult to define," Williams, 529 U.S. at 410, and that is surely the case here -- particularly since the governing legal rule to be applied is itself based on an assessment of "reasonableness."  But for the reasons described above, the Appellate Division's determination that there was no reasonable likelihood that the jury applied the trial

court's reasonable doubt instruction in a way that violated the Constitution represents "some increment of incorrectness beyond error" -- even if that increment is not "great." Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000)(quoting Francis S., 221 F.3d at 111). Here, there was simply too high a potential for the jury to have misunderstood the burden of proof to be applied due to the court's instructions. See Gaines, 202 F.3d at 610 (concluding, under the AEDPA standard, that "there is a reasonable likelihood that the jury applied the instruction given it in an unconstitutional manner"); Doyle, 130 F.3d at 539 (same).

### 2. Accomplice Liability Charge

The petitioner also complains of the court's jury instructions regarding accomplice liability. The court instructed the jury on accomplice liability primarily through the use of a series of examples. While examples may, in some circumstances, help to give concrete meaning to abstract legal theory, in general "hypothetical illustrations should be avoided because of the likelihood that they may divert the jury" from the facts of the case before it. United States v. Cassino, 467 F.2d 610, 619 (2d Cir. 1972). In particular, "the use in a criminal case of a hypothetical that assumes guilt where defendant asserts his innocence is disfavored." United States v. Dove, 916 F.2d 41, 46 (2d Cir. 1990). This is because the use of such an illustration is likely to be "more prejudicial than helpful and would tend to skew the jury away from the truth

36

rather than toward it." Id.; accord United States v. Salameh, 152
F.3d 88, 142 (2d Cir. 1998). Furthermore, "examples paralleling
the facts of the case under consideration by a jury are disfavored"
because they are more likely to be prejudicial than helpful.
United States v. Gaggi, 811 F.2d 47, 62 (2d Cir. 1987); see also
United States v. Gleason, 616 F.2d 2, 14 (2d Cir. 1979)("[T]he
choice of an example too close or analogous to the facts of the
case on trial is likely to be more prejudicial than helpful and is
quite unnecessary when other clearly non-prejudicial examples are
available.") (internal quotation marks omitted)); United States v.
Dizdar, 581 F.2d 1031, 1037 (2d Cir. 1978) ("trial judge would have
been better advised to use some other example"); Levine v. Scully,
No. 92 Civ. 8337, 1994 WL 455473, at *5 (S.D.N.Y. Aug. 22,
1994)("[A] neutral or unrelated hypothetical has been found to be
superior to one that involves facts similar to those in the case
presently before the jury since it creates no risk that the example
given will influence the jury's interpretation of the evidence
before it.").

In this case, Justice McLaughlin used five examples to
illustrate accomplice liability. In each one, the defendant's
guilt was assumed. Moreover, two of the examples closely
paralleled the facts of Mr. Jones' case. In the first, the judge,
shortly after beginning to state the law on accomplice liability,
shifted into a hypothetical involving a shooting with two

perpetrators, much like in the petitioner's case.  (Tr. at 727).
The judge told the jury that "[i]f a person has the mental element
to cause injury to the person at whom the gun is pointed, even if
they don't have a gun, even if they had a gun and fired and missed,
. . . the one who fired and missed or the one who threatened with
a gun but didn't fire" would be just as guilty, provided they
"ha[d] a common goal." (Tr. at 727).  That example was essentially
a simplified version of facts as presented by the prosecution in
the case at bar.  Mr. Jones was alleged to have accompanied the
shooter, Mr. McCall, to the confrontation with the intent to assist
him, even though he may not have had been armed, fired a gun, or
ever hit the victim.  (Tr. at 701-03).  An example so close to the
facts of the petitioner's case and which posited the petitioner's
intent, and thus his guilt, posed a serious risk of prejudicing the
jury.

Another of Justice McLaughlin's examples also hewed quite
closely to the facts of the petitioner's case.  That hypothetical
involved a shooting, this time in a hallway, in which "one person
. . . is standing behind the door peeking out, he sees the victim
come onto the hallway and says, 'He's here,' and then somebody else
. . . steps into the hallway and shoots him.  (Tr. at 783).  There
the judge said "a jury could find that the identifier, the observer
is in concert, but is not a shooter." (Tr. at 783).  Again, the
example paralleled the facts of the trial -- one of the

prosecution's theories was that Mr. Jones may have acted as a lookout for, or otherwise assisted, Mr. McCall without having actually firing a gun himself. As a result, the risk of prejudice was again heightened.[12]

The respondent points out that the court correctly stated the law on accessorial liability in both its final and supplemental jury instructions. (Resp. Memo. at 33-34; Tr. at 725-29, 780-84). However, as noted above, merely stating the correct standard at some other juncture does not necessarily render an otherwise problematic jury instruction constitutional. See Bloomer, 162 F.3d at 194. Here, the prejudice was compounded by the judge's failure to emphasize at any point that the examples in question were

---

[12] Justice McLaughlin was not unaware of this risk. In a conference that preceded his recitation of the second example, both the prosecution and the defense entreated him to avoid further examples and simply give the standard New York Criminal Justice Instructions on accessorial liability. The prosecutor stated that "I think the Court would be better off not giving an example, but simply sticking to the elements that were discussed during the charge." (Tr. at 777). The defense attorney said, "Our position is similar to the prosecution. We ask that you not give any examples and . . . give the current full CJI charge on accessorial liability." (Tr. at 777). Justice McLaughlin rejected these requests on the grounds that giving the pattern jury instruction would not constitute a "meaningful" response to a note sent by the jury.

However, that note asked for "[a] statement of the elements of a crime carried out 'in concert,' in particular, the definition of an 'action' by the defendant guilty of acting in concert even if he is not a shooter." (Tr. at 773). In asking for the "definition" of an action, the jury did not call for hypotheticals or for an example of an action. Cf. United States v. Hayes, 553 F.2d 824, 829-30 (2d Cir. 1977)(judge's use of examples appropriate because jury specifically requested further explanation "in layman's language").

unrelated to the case at trial and were not to be taken to suggest a particular outcome.  <u>Gaggi</u>, 811 F.2d at 62 (prejudice mitigated by repeated warning to the jury "not to equate the examples given with the facts in the case before it"); <u>Gleason</u>, 616 F.2d at 14-15 (finding judge's use of hypothetical not prejudicial because he took care to state that it was "'an illustration that quite obviously has nothing to do with the present case'" and told jurors to use their "common sense" in interpreting it); <u>Dizdar</u>, 581 F.2d at 1037 (potential prejudice from use of hypothetical ameliorated by simultaneous instruction that example "'has nothing to do with this case,' and that it 'was not intended and cannot be taken by you in any way to suggest any particular direction to be given to the evidence in the case'").  Nor did the court issue any curative instructions with regard to the examples.  <u>See</u> <u>Dizdar</u>, 581 F.2d at 1037 ("extensive supplemental instruction cur[ed] whatever prejudice might have been created by the illustration").

The judge also used three other examples to illustrate the concept of acting in concert.  One involved a robbery with multiple actors who performed various roles, another involved an orchestra, and the third involved a multi-state murder-for-hire.  Though all were disparate from the instant case on their facts, it is not clear that they assisted the jury in better understanding the concept of accomplice liability, and each one posited the defendant's guilt.  Thus, they could not serve as "other

non-prejudicial examples" to off-set the potential harm of the
previous two examples.  <u>Gaqqi</u>, 811 F.2d at 62; <u>see also</u> <u>Salameh</u>,
152 F.3d at 143 (prior neutral example adequately advised jury of
law on circumstantial evidence).

Compounding the damage of these examples, the judge issued
several other instructions on accomplice liability that were, at
best, confusing.  First, the judge likened accomplice liability to
pregnancy, explaining that "[y]ou are either in it or not. . . .
You are either a little involved or you are not involved.  You are
either a lot involved or you are not involved.  Percentages don't
matter."  (Tr. at 730).  This instruction ran the risk of further
perplexing the jury as to the burden of proof, potentially leading
them to believe that the prosecution only needed to establish Mr.
Jones' involvement by a preponderance of the evidence.  Combined
with the court's other confusing instructions on the burden of
proof, the potential for prejudice was significant.

Second, the judge responded to a note from the jury asking
"whether accompanying a man to a confrontation, a man whom one
knows to be armed and that uses the weapon, is sufficient to
establish one's intent" (Tr. at 797), with a lengthy and fact-
specific discourse on the ways in which an individual could be
guilty as an accomplice by accompanying an armed man to a
confrontation.  (Tr. at 806-08).  The judge's answer -- posed at an
advanced stage of the deliberations -- was likely to be highly

41

determinative of the jury's view of petitioner's guilt, and an instruction discussing the specific facts of the petitioner's case risked prejudice.  See Bollenbach, 326 U.S. at 612. The wiser course at that juncture would have been to merely repeat the law on accomplice liability.  Furthermore, during the course of this supplemental instruction, Justice McLaughlin stated that this case presented a "unique situation" in which "presence could be enough" to establish the actus reus necessary for liability as an accomplice, "provided a jury beyond a reasonable doubt decided that the presence was for some purpose to assist the goal, the common purpose." (Tr. at 807).  However, in general, "[m]ere presence at the scene of a crime with knowledge of its perpetration does not render the observer accessorily liable." People v. Reyes, 82 A.D.2d 925, 926, 440 N.Y.S.2d 674,  675 (2d Dep't 1981); see also People v. Gjonaj, 179 A.D.2d 773, 774, 579 N.Y.S.2d 140, 141 (2d Dep't 1992); People v. Strawder, 124 A.D.2d 758, 759, 508 N.Y.S.2d 256, 258 (2d Dep't 1986).  Indeed, the court stated this general principle earlier in its instructions to the jury. (Tr. at 728-29, 783-84).  Section 20.00 of the Penal Law requires both that an accomplice act with the "mental culpability required for the commission" of the particular crime and that the accomplice "solicit[], request[], command[], importune[], or intentionally aid[]" the principal.  N.Y. Penal Law § 20.00; see generally People v. Kaplan, 76 N.Y.2d 140, 144-45, 556 N.Y.S.2d 976, 978-79

42

(1990). There must be some "goal-directed conduct" on the part of the defendant. <u>Kaplan</u>, 76 N.Y.2d at 145, 556 N.Y.S.2d at 979; <u>see also</u> <u>People v. Bello</u>, 92 N.Y.2d 523, 526, 683 N.Y.S.2d 168, 170 (1998) (key inquiry is "whether a defendant exhibited any calculated or direct behavior that purposefully affected or furthered [the crime]"). Thus, the judge's subsequent assertion that "mere presence could be enough" provided that it was "for some purpose to assist the goal" over-simplified the legal standard. Though in some instances the conduct might not involve overt action, there must still have been "conduct" on the part of the accomplice. Here, the judge went on to give examples of such conduct -- "being an alternate target . . . a pointer out . . . a distraction, anything"; however, these examples were at tension with his statement that the defendant's presence at the scene of the crime was sufficient to establish guilt. (Tr. at 807-08). If the jury took the judge's instruction on the sufficiency of that presence seriously, as they are presumed to have done, <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987), they could have ignored the second element of the charge under section 20.00 -- that the accomplice "intentionally aid" the principal.

The judge's instruction also assumed certain factual findings with regard to the defendant's mental state. Justice McLaughlin recognized that he was making some assumptions: prior to issuing the instruction, he told counsel, "[I]t seems to me that they're

pre-supposing in their note, knowledge on the part of an unarmed person that the unarmed person is accompanying an armed person to a thwarted confrontation." (Tr. at 800). When defense counsel objected that there was no evidence "that there was a pre-arranged, armed confrontation," the judge responded that he was merely "addressing their note" and that the jury was "presupposing facts which cause[d] [them] to ask the question." (Tr. at 801-02). However, while the jury's note expressly presumed that the alleged accomplice knew that the principal was armed, there was no indication that the jury was suggesting that the accomplice knew of the purpose of the weapon or of the impending confrontation. Justice McLaughlin's imputation of such a finding regarding intent was prejudicial.

Finally, the evidence against Mr. Jones, while not insignificant, was hardly overwhelming. Apart from the victim, there were two eyewitnesses to the crime. Mr. Leslie testified that he saw the petitioner standing near Mr. Gonzaga just after the shooting, but did not see him get shot. Ms. Lacayo, the only disinterested witness, did not definitively place Mr. Jones at the scene of the crime at all. To the extent that she did, he may have been unarmed or fired only in self-defense. Meanwhile, Mr. Gonzaga, the sole witness to identify Mr. Jones as the shooter, had, as noted above, a possible motive for falsely accusing the petitioner. In addition to the feud between Mr. Gonzaga's and Mr.

Jones' associates, Mr. Gonzaga would have been subject to incarceration if he had been found to be in possession of a weapon and thus had an incentive to provide a version of events that exculpated himself.   So, while it is not true here that "[v]irtually all of the circumstantial evidence pointed towards the possibility of innocence," Dove, 916 F.2d at 46, it also cannot be said that the evidence the petitioner's guilt was so strong that the risk of prejudice from the confusing jury instructions was minimal.   See United States v. Frady, 456 U.S. 152, 172 (1982) ("strong uncontradicted evidence of malice" reduced risk of prejudice from improper jury instruction).

Standing alone, the court's instructions and prejudicial examples were already likely to have confused the jury as to the appropriate standard for determining accomplice liability.   But these instructions should not be viewed in isolation.  As described above, a reviewing court must consider an erroneous jury instruction in the context of the instructions as a whole and the trial record, Estelle, 502 U.S. at 72, and must examine the cumulative effect of error in the instructions.  See Gaines, 202 F.3d at 608 ("Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect, so as to deny due process.") (quoting United States v. Fernandez, 145 F.3d 59, 66 (1st Cir. 1998)); see also Birbal, 62 F.3d at 460; Morales, 577 F.2d at 777.  In general,

> in order to determine whether a criminal defendant received a fair trial, an examination of the entire record is required, "paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect; how the trial court dealt with the errors, including the efficacy of any remedial measures; and the strength of the prosecution's case."

Joyner v. Miller, No. 01 Civ. 2157, 2002 WL 1023141, at *13 (S.D.N.Y. Jan. 7, 2002)(quoting Alvarez v. Boyd, 225 F.3d 820, 825 (7th Cir. 2000)); see also Brumfield v. Stinson, 297 F. Supp. 2d 607, 621 (W.D.N.Y. 2003)("[i]f no one error requires reversal, the whole body of error is to be assessed for prejudicial effect.") (quoting Sanders v. Sullivan, 701 F. Supp 1008, 1013 (S.D.N.Y. 1988); Collins v. Scully, 878 F. Supp. 452, 460 (E.D.N.Y. 1995).

Here, the court unquestionably erred in its reasonable doubt and accomplice liability charges, and its use of examples in both instances was confusing and prejudicial. The interaction of these two erroneous instructions, however, was particularly deleterious because it allowed the jury to conclude that certain elements of the accomplice charge -- for instance, the act necessary to find the petitioner guilty of aiding in the crime -- could be established using a standard less rigorous than beyond a reasonable doubt. The fact that the jury sent out several notes asking for clarification on precisely these points near the end of its deliberations suggests both that it was confused on these points and that its interpretation of the judge's instructions was central to its verdict. Justice McLaughlin made no effort to remedy these

errors; indeed, with respect to the issue of accomplice liability, he arguably compounded them by offering additional prejudicial hypotheticals.   Finally, the prosecution's case was not overwhelming.  These errors therefore created at least a reasonable likelihood that the jury applied the challenged instructions in a way that violates the Constitution.  See Estelle, 502 U.S. at 72. Given the extent of the error and the centrality of the issues implicated, the Appellate Division's ruling to the contrary was an unreasonable application of clearly established Supreme Court law, and the petition should be granted on this ground as well.

### 3. Refusal to Give Justification Charge

Mr. Jones next claims that his right to due process was violated by the trial court's refusal to instruct the jury on justification.  Like an improper jury charge, a jury instruction improperly withheld can be the basis for habeas relief if the trial's court's failure to give the charge "so infected the entire trial that the resulting conviction violates due process." Henderson v. Kibbe, 431 U.S. 145, 154-55 (1977) (quoting Cupp, 414 U.S. at 147, and noting that "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law").  In order to grant habeas relief for the failure to give a justification charge, a reviewing court must resolve three questions in the petitioner's favor: "First, was he entitled to a justification charge?  Second, if so, did the failure to give one

result in a denial of due process?  Third, if so, did the state court's contrary conclusion constitute an unreasonable application of clear Supreme Court law?"  <u>Jackson v. Edwards</u>, 404 F.3d 612, 621 (2d Cir. 2005).  "In determining whether a petitioner was entitled to a defense under state law, federal courts must of course defer to state-court interpretations of the state's laws, so long as those interpretations are themselves constitutional."  <u>Davis v. Strack</u>, 270 F.3d 111, 123 n.4 (2d Cir. 2001).  The federal court's "role here is not to interpret New York's law of justification, but to determine whether the evidence was sufficient to warrant a justification charge under that law."  <u>Id.</u>; <u>accord</u> <u>Jackson</u>, 404 F.3d at 621-22.

a.  <u>State Law</u>

New York Penal Law § 35.15 defines the justification defense in relevant part as follows:

> 1. A person may, subject to the provisions of subdivision two, use physical force upon another person  when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person . . . .

> 2. A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:

> (a) The actor reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating[.]

48

Thus, "[i]n order to be entitled to a justification instruction, a defendant must show both that he subjectively believed that [the] force [used] was necessary under the circumstances and that a reasonable person in his situation would have held this belief." Blazic v. Henderson, 900 F.2d 534, 540 (2d Cir. 1990). Once justification is raised at trial, the prosecution has the burden of disproving it beyond a reasonable doubt. N.Y. Penal Law §§ 25.00(1), 35.00; Davis, 270 F.3d at 124; In the Matter of Y.K., 87 N.Y.2d 430, 433, 639 N.Y.S.2d 1001, 1003 (1996).

Under New York law, a jury charge on justification "is warranted whenever there is evidence to support it." People v. McManus, 67 N.Y.2d 541, 549, 505 N.Y.S.2d 43, 48 (1986). That is, the court should give a justification charge "if on any reasonable view of the evidence, the fact finder might have decided that defendant's actions were justified." Jackson, 404 F.3d at 622 (quoting People v. Padgett, 60 N.Y.2d 142, 145, 468 N.Y.S.2d 854 856 (1983)); see also Blazic, 900 F.2d at 540 (justification charge warranted if there exists "a reasonable view of the evidence from which a jury could conclude that the defendant's acts were justified," though court is "not required to adopt an artificial or irrational view of the evidence"). Moreover, "[t]he New York Court of Appeals has 'rejected a restrictive application of the defense.'" Jackson, 404 F.3d at 622 (quoting McManus, 67 N.Y.2d at 547, 505 N.Y.S.2d at 46). Accordingly, in deciding whether a

49

charge is warranted, the evidence should be construed in the light most favorable to the defendant. Blazic, 900 F.2d at 540; McManus, 67 N.Y.2d at 549, 505 N.Y.S.2d at 48.  "In sum, if the record includes evidence which, viewed in the light most favorable to the defendant and drawing all reasonably permissible inferences in his favor, satisfies the essential elements of the defense of justification, the charge must be given." Davis, 270 F.3d at 125; see generally Dove, 916 F.2d at 47 ("[A] criminal defendant is entitled to instructions relating to his theory of defense, for which there is some foundation in the proof, no matter how tenuous that defense may appear to the trial court.").

Here, the evidence was sufficient to support a justification charge.  Several versions of the events of December 12, 2001 were presented to the jury.  The petitioner, in a statement to police and in grand jury testimony that was introduced at trial, claimed that he was merely a bystander to a shootout between several other men.  That version would clearly not have supported the giving of a charge on justification.  The prosecution's version, based essentially on the testimony of Mr. Gonzaga, had the petitioner (and others) shooting at Mr. Gonzaga, who was unarmed, in which case a justification charge would not be warranted either.  The third account of the shooting was that of the defense witness, Ms. Lacayo.  She described an encounter in which a tall, armed Latino man drew first and exchanged gunfire with a tall, armed black man,

while another unarmed black man stood by. This latter account
could support a theory that the two black men (presumably Mr.
McCall and the petitioner) acted in self-defense. Viewing the
evidence in the light most favorable to the defendant, whoever
fired the gun could have reasonably believed that the Latino man
(presumably Mr. Gonzaga) was about to use deadly force against them
and that they would not be able to retreat to safety in time.[13] See
N.Y. Penal Law § 35.15(2)(a). Indeed, Justice McLaughlin seemed to
acknowledge as much, saying that "In this case . . . it's self-
defense [] if you believe the lady." (Tr. at 614). However, when
the defense asked that a justification charge therefore be given to
the jury, he refused on the ground that it would directly
contradict the defendant's grand jury testimony that "he wasn't
close enough to be involved in the event, he didn't shoot anybody
and he didn't have a gun." (Tr. at 626). But as defense counsel
argued at the time, while he certainly hoped that the jury would
believe his client's grand jury testimony, the jury might well
conclude that "Mr. Jones was one of the two black men" and that
"the Hispanic pulled out the gun first." (Tr. at 626-27). As the
Appellate Division recognized, Jones, 19 A.D.3d at 220, 797
N.Y.S.2d at 64, a defendant has a right to assert inconsistent
theories of defense under both state law, see People v. Steele, 26

---

[13] Further supporting the petitioner's reasonable belief that
he was in danger is the fact that Mr. McCall had shot at Mr.
Gonzaga's friend, Mr. Leslie, just two days prior.

N.Y.2d 526, 529, 311 N.Y.S.2d 889, 891-92 (1970); People v. Ramkissoon, 36 A.D.3d 834, 835, 829 N.Y.S.2d 157, 159 (2d Dep't 2007), and federal law, see Mathews v. United States, 485 U.S. 58, 63-64 (1988). Moreover, such an inconsistency is no bar to giving a justification charge. See, e.g., Blazic, 900 F.2d at 538-39; Padgett, 60 N.Y.2d at 146, 468 N.Y.S.2d at 857.

Justice McLaughlin refused to give an instruction on justification on the additional ground that it "would essentially direct [the jury] to find him guilty of having a pistol . . . . because in my view on [Ms. Lacayo's] testimony the only way you could get justification is if she identified [Mr. Jones] as the shooter, the black male with the gun pulling the trigger," which she had not. (Tr. 627). This rationale for refusing to give an instruction is likewise uncompelling. First, the prosecution had made it abundantly clear that it was arguing that Mr. Jones could be guilty as an accomplice to Mr. McCall even if he did not have a gun (Tr. at 622, 701-03), in which case justification for Mr. McCall firing a gun would still have been relevant. See People v. Badillo, 218 A.D.2d 811, 812, 630 N.Y.S.2d 798, 799 (2d Dep't 1995) ("It is unnecessary for the defendant to admit inflicting the fatal wound by his own hand if the charge [of justification] is otherwise supported by the evidence."). Second, the prosecution and the judge acknowledged that the jury might well find that the petitioner had possessed a gun whether or not it accepted Ms.

Lacayo's testimony, thus mooting the judge's avowed concern.[14] Finally, the giving of an instruction on justification does not depend on whether it is consistent with all the testimony or whether it is supported by every theory of the defense; as noted above, the defense is fully entitled to present alternative and inconsistent theories. Instead, the standard is whether there was any reasonable view of the evidence "viewed in the light most favorable to the defendant and drawing all reasonably permissible inferences in his favor" that satisfied the elements of justification, Davis, 270 F.3d at 123, and that standard was amply met here.

Notwithstanding this clear error, the Appellate Division upheld the trial court's ruling on the ground that "no reasonable view of the evidence supported a justification defense." Jones, 19 A.D.3d at 220, 797 N.Y.S.2d at 64. The Appellate Division went on to say that "[i]n order to find that [the] defendant acted in self-defense, the jury would have to take an arbitrary and speculative view of the integrated testimony of a defense witness." Id. at 220, 797 N.Y.S.2d at 64 (citing People v. Negron, 91 N.Y.2d 788, 792-93, 676 N.Y.S.2d 520, 522-23 (1998)). This observation was incongruous. The Appellate Division was presumably referring to

---

        [14]  The prosecution argued that finding that Mr. Jones' had a gun was not necessarily inconsistent Ms. Lacayo's version of events (Tr. at 624-25), while the judge said "[I]f the jury decides that Mr. Jones happens to be the black guy with the gun shooting, who am I to say otherwise?"

Ms. Lacayo's testimony, suggesting that if jurors accepted it, they had to conclude that Mr. Jones was not involved at all, and thus, that justification was inapplicable.  Conversely, in the Appellate Division's view, if the jury believed that Mr. Jones was involved, it had to disbelieve Ms. Lacayo's testimony and thus discount the primary evidence that supported justification.  But as both counsel and Justice McLaughlin recognized at trial, it would not have been inconsistent with Ms. Lacayo's testimony to find that the petitioner had been at the corner and had participated in the gunfight.  She testified that she saw two black men at the corner, one of whom had a gun and one who did not, and though she described both black men as tall (whereas the petitioner is short), it was certainly possible for the jurors to conclude that either the armed or the unarmed man in Ms. Lacayo's description was the petitioner. In fact, the prosecution argued on closing that Mr. Jones' presence on the corner was not inconsistent with Ms. Lacayo's testimony. (Tr. at 692-93).

The court's reliance on <u>Negron</u> was also misplaced.  <u>Negron</u> held that the court need not charge the jury on a lesser included offense where "the single witness' testimony essential to support a verdict of guilt of the lesser offense was substantially identical to the testimony establishing guilt of the greater crime."  91 N.Y.2d at 793; 676 N.Y.S.2d at 522.  In this case there were two witnesses, not one, and the evidence establishing the

offense was drawn primarily from the account of one witness -- Mr. Gonzaga -- while the evidence establishing justification was drawn from the other. The jury could have rejected Mr. Gonzaga's testimony, accepted Ms. Lacayo's, and decided that the shooting was justified without there being any logical inconsistency. Alternatively, as the court in Negron itself held, the jury could have credited only part of Ms. Lacayo's testimony. Id. at 792, 676 N.Y.S.2d at 522 ("A jury is entitled to assess the credibility of witnesses and determine, for itself, what portion of their testimony to accept and the weight such testimony should be given."); see also United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994) ("Where there are conflicts in the testimony, we must defer to the jury's resolution of [them][.]"); United States v. Projansky, 465 F.2d 123, 136 & n.24 (2d Cir. 1972)(finding no error in court's instruction that jury should weigh credibility of witness at trial even though he admitted to committing perjury before grand jury).

In sum, the petitioner was entitled to a charge on justification and the Appellate Division's committed error by ruling that he was not.

b. Violation of Due Process

As explained above, the habeas inquiry does not end with the identification of an error of state law. The reviewing court must next assess whether that error was of sufficient magnitude to have

violated due process.  Jackson, 404 F.3d at 621; Henderson, 431 U.S. at 154.  The question to be determined is whether the trial court's refusal to give the justification instruction "so infected the entire trial that the resulting conviction violates due process." Cupp, 414 U.S. at 147.  "This occurs when the denial of a justification instruction was 'sufficiently harmful to make the conviction unfair.'" Jackson, 404 F.3d at 624 (quoting Davis, 270 F.3d at 124).

In Jackson, the Second Circuit found that the refusal to give a justification charge violated the petitioner's due process rights.  404 F.3d at 626.  In so doing, the court discussed two leading Second Circuit precedents, Davis v. Strack and Blazic v. Henderson.  In Davis, the court affirmed the district court's grant of a writ of habeas corpus, finding that the failure to instruct on justification was of "immense importance" because it was not "a case of a refusal to instruct on a fantastic, improbable defense that the jury was unlikely to adopt."  270 F.3d at 132.  Instead, the failure to instruct the jury on justification deprived Davis of a "highly credible defense" to homicide.  Id. at 131.  In Blazic, by contrast, the court found that "the state court's error under New York law in failing to give a justification instruction did not violate due process because it "would not have affected the jury's verdict." Blazic, 900 F.2d at 542.  The Jackson court found the circumstances of the case before it to be much closer to Davis than

to <u>Blazic</u> and consequently determined that the error was a violation of due process.

The instant case does not track <u>Jackson</u> and <u>Davis</u> perfectly, but on balance, it is much more akin to those cases than to <u>Blazic</u>. On the one hand, the defendants in <u>Jackson</u> and <u>Davis</u> each acknowledged shooting the victim but argued that they were not culpable because the shooting had been justified; that is not the case here, as Mr. Jones did not acknowledge shooting Mr. Gonzaga. Therefore, it is not true here that "[w]ithout an instruction on the justification defense, the question whether [the defendant] was guilty . . . was thus open and shut." <u>Davis</u>, 270 F.3d at 131.

On the other hand, the instant case is distinguishable from <u>Blazic</u> for several reasons. In <u>Blazic</u>, the defendant contended that a gun accidentally discharged as he struggled to wrestle it from his attacker. 900 F.2d at 542. At the end of a trial, in which no justification charge was given, he was convicted of second degree murder. The Second Circuit reasoned that because he was convicted of an offense that required a finding of intent, the jury must have rejected Mr. Blazic's assertion that the gun fired accidentally. <u>Id.</u> Since Mr. Blazic's testimony was the only evidence supporting a justification claim, the jury's rejection of his version of events for all practical purposes foreclosed a finding of justification. <u>Id.</u> at 543.

Here, the jury's finding of guilt presumably entailed a

rejection of the petitioner's grand jury testimony, in which he claimed he did not participate in the confrontation at all. However, rejecting Mr. Jones' grand jury testimony did not eliminate the only evidence for justification as it did in Blazic. While there are not the "numerous witnesses" that there were in Jackson, 404 F.3d at 626, there was still the account of the one disinterested eyewitness, Ms. Lacayo, that could support a theory of justification.[15] Meanwhile, the evidence against justification was not overwhelming, consisting solely of the account of Mr. Gonzaga, who, as discussed above, may have been less than candid.

Moreover, as in Davis, "the absence of an instruction on justification [was not] mitigated by other portions of the charge." 270 F.3d at 132 (citing Henderson, 431 U.S. at 156-57 (omission of instruction on causation did not violate due process because jury, in determining that defendant had acted recklessly, necessarily found that the harm was foreseeable)); see also Blazic, 900 F.2d at 542-43 (failure to charge justification did not deprive petitioner of due process because instruction on accidental and intentional killing left no basis to conclude that jury would have responded differently if charge was given); United States v. Pedroza, 750

_____

[15] Moreover, if the jurors' increasingly pointed notes toward the end of deliberation are any guide, they accepted Ms. Lacayo's testimony in large part but inferred that the petitioner was the second, unarmed black man on the corner whom they convicted as an accomplice to the man who actually fired the shots. If that was the case, a charge on justification would have been quite germane to their deliberations.

F.2d 187, 204-05 (2d Cir. 1984) (new trial warranted where court's generic instructions were inadequate to inform jury of defense theory).  To the contrary, the prosecution expressly noted in its closing argument that the defense of justification was not available because it had not been charged.  (Tr. at 697).

This case more closely resembles Jackson and Davis than Blazic because the petitioner arguably had a "significant possibility of prevailing" on justification.  Davis, 270 F.3d at 132; see also Jackson, 404 F.3d at 626 ("The probabilities [we]re substantial that, if given a justification charge, [the] jury might well have acquitted.").  Therefore, the trial court's refusal to give a justification charge was grave enough to deny the petitioner due process.  See Jackson, 404 F.3d at 626; Harris v. Dennison, No. 06 Civ. 1508, 2007 WL 2398821, at *8 (S.D.N.Y. Aug. 15, 2007)(failure to charge on agency defense violated due process because it "deprived petitioner of a defense on which he had a significant possibility of prevailing and virtually ensured his conviction" (quoting Davis, 270 F.3d at 132).

### c.  The AEDPA

The AEDPA standard of review must now be applied to the Appellate Division's decision.  Under the AEDPA, "[a] state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular person's case certainly would qualify as a decision 'involving an unreasonable

application of . . . clearly established Federal law.'" <u>Davis</u>, 270

F.3d at 133 (quoting <u>Williams</u> 529 U.S. at 407-08). Here, as in

<u>Davis</u>, "[o]n the basis of the evidence presented, [the petitioner]

had a clear right under New York law to have the jury consider his

defense, and the trial in which he was denied that right was

egregiously at odds with the standards of due process propounded by

the Supreme Court in <u>Cupp</u>." <u>Id.</u> (holding that the refusal to grant

a justification charge when warranted by the facts constituted a

"decision that was based on an unreasonable determination of the

facts in the light of the evidence" in violation of 28 U.S.C. §

2254(d)(2)); <u>see also</u> <u>Jackson</u>, 404 F. 3d at 627-28.[16]

     D.  <u>Ineffective Assistance of Trial Counsel</u>

     The petitioner claims that his counsel was ineffective on

three grounds. First, he argues that counsel should have requested

a jury charge that a defendant may not be convicted upon the

uncorroborated testimony of an accomplice. (440.10 Motion at 10-

12). Second, he claims that counsel should have requested that the

grand jury be instructed as to justification. (440.10 Motion at

---

    [16] The failure to charge the jury on justification relates only
to the charge of assault in the first degree, not to criminal
possession of a weapon. Under New York Law, justification under
Penal Law § 35.15 is not a defense to second degree criminal
possession of a weapon. <u>See</u> <u>People v. Pons</u>, 68 N.Y.2d 264, 265,
508 N.Y.S.2d 403, 403 (1986); <u>People v. Almodovar</u>, 62 N.Y.2d 126,
130-31, 476 N.Y.S.2d 95, 97-98 (1984); <u>but cf.</u> <u>Jackson</u>, 404 F.3d at
628 (trial court's failure to instruct jury on justification so
"infected the entire trial," that it "tainted not only the jury's
consideration of the homicide charge, but also its evaluation of
the weapons possession charge").

13-17).    Finally,    the    petitioner    claims    that    counsel    was
ineffective   for   failing   to   impeach   Mr.   Gonzaga   with   an   alleged
prior inconsistent statement contained in a police report. (440.10
Motion at 18-20).

In order to make out an ineffective assistance of counsel
claim,  the  petitioner  must  demonstrate  that  (1)  his  counsel's
performance was deficient, and (2) the deficient performance was
prejudicial.    Strickland v. Washington, 466 U.S. at 687; accord
Lockhart v. Fretwell,  506  U.S.  364,  369  (1993).    In  assessing
whether an attorney's performance was deficient, a reviewing court
must   determine   whether   his   conduct   "fell   below   an   objective
standard of reasonableness," given the facts and circumstances of
the particular case.  Strickland, 466 U.S. at 688.  The court must
be "highly deferential" and "indulge a strong presumption that
counsel's  conduct  falls  within  the  wide  range  of  reasonable
professional assistance."  Id. at 689.  The "prejudice" prong of
the Strickland test requires a "showing that counsel's errors were
so  serious  as  to  deprive  the  defendant  of  a  fair  trial,  a  trial
whose result is reliable," id. at 687, and that "but for counsel's
unprofessional errors, the result of the proceeding would have been
different."  Id. at 694.  The petitioner has not made that showing
here.

    1.  CPL § 60.22

The petitioner's first claim is that counsel was ineffective

for failing to invoke CPL § 60.22, which prohibits a conviction "upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission" of the crime. CPL § 60.22(1). "The corroboration must consist of 'evidence from an independent source of some material fact tending to show that defendant was implicated in the crime.'" People v. Moses, 63 N.Y.2d 299, 306, 482 N.Y.S.2d 228, 231 (1984) (quoting People v. Kress, 284 N.Y. 452, 460 (1940)); accord, e.g., People v. Picard, 32 A.D.3d 317, 320, 819 N.Y.S.2d 760, 763-64 (1st Dep't 2006). The petitioner claims that he and the victim, Mr. Gonzaga, could be viewed as accomplices. Such a claim is incredible on its face, given that he is accused of shooting at Mr. Gonzaga and that there is some indication of prior ill will between the two. Indeed, the claim was rejected by the trial court on the § 440.10 motion because "[i]n the absence of any reasonable view of the evidence that [the petitioner] and [Mr. Gonzaga] were accomplices, defense counsel was not ineffective for not requesting an accomplice corroboration charge under CPL § 60.22." (440.10 Decision at 1-2).

The petitioner, however, argues that he and Mr. Gonzaga should be treated as accomplices under the rule articulated in People v. Russell, 91 N.Y.2d 280, 670 N.Y.S.2d 166 (1998). In Russell, the New York Court of Appeals held that participants in a gunfight could be considered to have "intentionally aided and encouraged

each other" to engage in the battle, such that they had sufficient intent to be convicted of second degree murder for shooting of an innocent bystander.  91 N.Y.2d at 290, 670 N.Y.S.2d at 169.  The petitioner's contention that this makes Mr. Gonzaga his accomplice for the purposes of CPL § 60.22 is an interesting one; unfortunately, it is not supported by the law.  No case has expanded Russell in that manner, and one can easily see why.  CPL § 60.22 is designed to "preclu[de] [] conviction solely upon the testimony of persons who are in some way criminally implicated in, and possibly subject to, prosecution for the general conduct or factual transaction on trial."  CPL § 60.22 Comm. Staff Notes. Here, it is unclear whether Mr. Gonzaga was criminally implicated in the confrontation; certainly, he was never prosecuted for it. More importantly, the charges against Mr. Jones related to the injury to Mr. Gonzaga, not a bystander; treating Mr. Gonzaga as an accomplice here would mandate the unlikely holding that he was guilty of abetting his own shooting.

Even if one were to accept the petitioner's novel take on CPL § 60.22, there was independent evidence linking him to the shooting:  Mr. Leslie reported seeing him standing over Mr. Gonzaga and appearing to tuck something into his waistband, and Ms. Lacayo testified that she saw two black men at the scene of the crime. Inconclusive as such evidence may be, it need only "connect the defendant with the crime in such a way that the jury may be

reasonably satisfied that the accomplice is telling the truth." People v. Daniels, 37 N.Y.2d 624, 630, 376 N.Y.S.2d 436, 440 (1975); see also People v. Dixon, 231 N.Y. 111, 117 (1921) (matters seeming insignificant "may so harmonize with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime").

In any event, advancing a claim under Russell would require the petitioner to concede that he and Mr. Gonzaga "acknowledged and accepted each others' challenge to engage in" the gunfight. Russell, 91 N.Y.2d at 289, 670 N.Y.S.2d at 169. Such a concession contradicts Mr. Jones' two principal lines of defense: that he did not participate in the shooting and that, if he did, it was justified as self-defense. While, as noted above, a defendant is entitled to argue inconsistent theories, defense counsel's decision not to do so here for such a long-shot defense was understandable. In general, a habeas court should not "second-guess trial counsel's defense strategy simply because the chosen strategy has failed." United States v. DiTommaso, 817 F.2d 201, 216 (2d Cir. 1987); see also Strickland, 466 U.S. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). Here, defense counsel's decision was certainly reasonable enough that "judged in context and without the benefit of hindsight, trial counsel's performance as a whole did not constitute ineffective assistance." Smalls v.

McGinnis, No. 04 Civ. 0301, 2004 WL 1774578, at *19 (S.D.N.Y. Aug. 10, 2004).

### 2.  Grand Jury Justification Instruction

The petitioner argues that defense counsel should have demanded that the prosecutor charge the grand jury on justification.  This claim was also advanced by the petitioner in his CPL § 440.10 motion, and was denied by the court on the ground that nothing in the record at that time gave defense counsel any reason to think that a justification defense was applicable. (440.10 Decision at 2).  The defendant testified to the grand jury that he was an innocent bystander not involved in the shooting, and Ms. Lacayo's testimony had not yet come to light.  Justice McLaughlin's reasoning was sound and applies equally at this stage of the proceedings.  Moreover, New York law does not allow defense counsel the opportunity to demand a particular charge during grand jury proceedings.  See CPL § 190.52(2); People v. Riley, 98 Misc. 2d 454, 458, 414 N.Y.S.2d 441, 443 (Queens Sup. Ct. 1979)("Counsel is limited to merely advising [his client] and barred from involving himself in any other aspect of the proceedings.").  Consequently, his failure to do so certainly could not have constituted ineffective assistance of counsel.

### 3.  Prior Inconsistent Statement

Finally, the petitioner argues that counsel was ineffective for failing to impeach Mr. Gonzaga with a prior inconsistent

statement.  The statement at issue was contained in a police report (known as a "DD5").  In it, Mr. Gonzaga's sister related that after the shooting,  Mr. Gonzaga had told her that "Junior was shooting or Junior shot me."  (440.10 Decision at 2).  The petitioner contends that this statement suggests that an unidentified assailant named Junior was responsible for the shooting.  However, as the trial court pointed out in denying the motion, the sister's admission that she was "not really sure" what the victim had said certainly undercut the impeachment value of the statement. Furthermore, the statement is not necessarily inconsistent with Mr. Gonzaga's testimony, since he testified at trial that a number of men shot at him (though he did not name "Junior" as being one of the shooters).  Nor is it inconsistent with Mr. Jones' guilt, as the prosecution had argued that he was either one of several who shot at the victim or, perhaps, an unarmed accomplice.  In short, the petitioner has not shown that counsel's conduct in failing to make use of the DD5 statement "fell below an objective standard of reasonableness," nor can he show that "the result of the proceeding would have been different" had the statement been used. Strickland, 466 U.S. at 688, 694.  Consequently, this claim should be denied as well.

Conclusion

    For the reasons set forth above, I recommend that Mr. Jones' petition for a writ of habeas corpus be granted on the basis that

charge on the burden of proof; (2) the erroneous jury charge on accomplice liability; and (3) the court's refusal to charge the jury on justification. In each case, the state court's determination was an unreasonable application of well established constitutional principles. I also recommend that the petitioner's ineffective assistance of counsel claims be rejected. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Loretta A. Preska, Room 1320, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          August 29, 2008

Copies mailed this date to:

Jamie Lamont Jones
02-R-6668
Five Points Correctional Facility
P.O. Box 119
Route 96
Romulus, New York 14541

Ashlyn Dannelly, Esq.
Jodi A. Danzig, Esq.
Assistant Attorneys General
120 Broadway
New York, New York 10271