UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------X
JAMIE LAMONT JONES,                    :    07 Civ. 6587 (LAP)
                                       :
                Petitioner,            :    MEMORANDUM & ORDER
                                       :
     v.                                :
                                       :
THOMAS POOLE,                          :
                                       :
                Respondent.            :
------------------------------------X
```

LORETTA A. PRESKA, Chief United States District Judge:

In 2003, Pro se Petitioner Jamie Lamont Jones was
tried and convicted by jury in the Supreme Court of the
State of New York of two counts of Assault in the First
Degree (N.Y. Penal Law § 120.10) and one count of Criminal
Possession of a Weapon in the Second Degree (N.Y. Penal Law
§ 265.03). Petitioner now brings this Petition under 28
U.S.C. § 2254 for a Writ of Habeas Corpus (the "Petition").

On August 29, 2008, Magistrate Judge Francis issued a
thorough Report and Recommendation ("the Report") [dkt. no.
13] recommending that this Court grant the Petition.
Within the ten day objection period, this Court received
Petitioner's and Respondent's objections to the Report.

Having considered the objections and upon de novo
review of the Report, see 28 U.S.C. § 636(b)(1); Fed. R.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/26/09

Civ. P. 72(b), this Court concludes that Petitioner's application for a writ of habeas corpus must be DENIED.

## I. BACKGROUND

By Indictment No. 622/02, Petitioner was indicted on one count of Attempted Murder in the Second Degree (N.Y. Penal Law §§ 110, 125.25), two counts of Assault in the First Degree (N.Y. Penal Law § 120.10), two counts of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03), one count of Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02), and one count of Assault in the Second Degree (N.Y. Penal Law § 120.05).

On or around March 10, 2003, Petitioner was tried by jury in the Supreme Court of the State of New York, before Justice Edward McLaughlin (the "trial court"). The jury convicted Petitioner of two counts of Assault in the First Degree and one count of Criminal Possession of a Weapon in the Second Degree.

## Evidence at Trial

Eliphelety Gonzaga and Michael Leslie were the People's primary witnesses. They testified that on December 12, 2001, they were walking along 112th Street in

2

Manhattan on their way to a grocery store. (Tr. at 328-29, 356, 394-95.)  Two days earlier, on December 10, Mr. Leslie had gotten into a fistfight with Henry McCall after Mr. McCall tried to steal Mr. Leslie's necklace. (Tr. at 399-400, 410.)  Mr. McCall left after the fight but returned later with a gun and shot at Mr. Leslie, grazing his neck with a bullet. (Tr. at 400.)  Mr. Gonzaga had been with Mr. Leslie during that shooting. (Tr. at 401.)

As Mr. Gonzaga and Mr. Leslie were walking to the grocery store on December 12, Mr. Leslie stopped to tie his shoe and to talk to a friend while Mr. Gonzaga proceeded alone to the corner of 112th Street and First Avenue. (Tr. at 394-95.)  According to Mr. Gonzaga, he was approached at the corner by Mr. McCall and four other men, including Petitioner. (Tr. at 329-30, 353-55.)

These men formed a "half circle" blocking Mr. Gonzaga's path, then pulled out guns, aimed at Mr. Gonzaga and began shooting. (Tr. at 330-32, 339-40, 353-55.)  According to Mr. Gonzaga, Mr. McCall, Petitioner and one of the other men had guns. (Tr. at 330-33, 338.)  Mr. Gonzaga testified that Petitioner aimed and shot at Mr. Gonzaga's head. (Tr. at 330-31.)  Mr. Gonzaga testified that he was unarmed. (Tr. at 381).  Several shots were fired, one of which hit Mr. Gonzaga in the head, rendering him blind in

3

the left eye. (Tr. at 332-34, 396.)   Another shot
apparently hit a bystander, Angela Gutierrez, in the left
ankle. (Tr. at 449-53, 453.)

Mr. Leslie testified that he arrived shortly after the
shots were fired, at which point he saw Petitioner standing
very close to Mr. Gonzaga and then running away down First
Avenue "reaching back into his jeans" as if "putting
something in or taking something out." (Tr. at 395-96, 398-
99.)   Mr. Leslie did not see anyone fire a shot and did not
see who had a gun. (Tr. at 395-96.)

Two police officers testified that they were on patrol
at First Avenue and 115th Street on December 12, 2001, and
heard shots fired. (Tr. at 448-49.)   The officers drove to
the corner of 112th Street where they found a "chaotic"
scene with officers and civilians gathered around Ms.
Gutierrez, who had been taken to a parked van. (Tr. at 448-
50.)   Another officer, Detective John Gisonno, testified
that when he arrived at the scene and searched the
surrounding areas he found Mr. Gonzaga slumped in a hallway
outside his apartment, bleeding from the head. (Tr. at 481-
82, 501-02.) No weapons were found on Mr. Gonzaga or at the
scene of the crime. (Tr. at 482-86.)

For Petitioner's case, Petitioner's counsel called
another witness to the shooting, Angela Lacayo, in order to

4

present an alternative version of the events of December
12. Ms. Lacayo testified that she was a home health
attendant to Ms. Gutierrez and was accompanying Ms.
Gutierrez down First Avenue toward 112th Street on the
evening of December 12. (Tr. at 554-55.) Ms. Lacayo saw a
tall, thin Latino man walking east on 112th Street toward
First Avenue and two tall, skinny black men walking up
First Avenue toward 112th Street. (Tr. at 555-56, 563-64.)
These three men, and only these three, converged at the
corner. (Tr. at 556, 579-80.) She then saw the Latino man
"lift up his shirt" and pull out a gun. (Tr. at 556.) One
of the two black men also pulled out a gun, and he and the
Latino man began shooting at each other. (Tr. at 556-68.)
There seems to have been some confusion with the
translation of Ms. Lacayo's testimony about whether the two
shooters took out their guns, walked towards each other,
and then began shooting or whether they "took out the arms
and they just started to shoot." (Tr. at 565-567.) At one
point, Ms. Lacayo testified that "[t]he Latino man took out
his gun and then the black man took out the gun as well and
then they moved away and they started to shoot out," (Tr.
at 567), while later in her testimony, Ms. Lacayo said the
two men drew their guns "at the same time," walked away and
then started to shoot (Tr. at 593). In any event, Ms.

Lacayo testified that the two shooters backed away from
each other while exchanging gunfire and then fled in
opposite directions. (Tr. at 564-65.)  Ms. Lacayo did not
see whether either man was injured. (Tr. at 587-88.)

Ms. Lacayo testified that the events unfolded
"quickly" and that just after the shooting started, Ms.
Gutierrez fell down and started bleeding from the leg. (Tr.
at 559-60, 585-87.)  At trial, Ms. Lacayo did not recognize
or identify Petitioner as one of the men she saw in the
shootout. (Tr. at 589.)  She testified that she did not see
whether the second black man had a gun. (Tr. at 556.)

Neither Petitioner nor Mr. McCall testified at the
trial.  However, a statement that Petitioner gave to
Detective Gisonno after his arrest was read as evidence.
(Tr. at 490-91, 493-94.)  In that statement, Petitioner
claimed to have been in the vicinity of the shooting, to
have seen a number of people including Mr. McCall arguing
on the corner, and to have left the scene when he heard
shots fired. (Tr. at 494.)  He testified similarly to the
grand jury, and that testimony was also read as evidence.
In that testimony, Petitioner identified Mr. Gonzaga and
another man known as "Black" as two of the men arguing on
the corner with Mr. McCall. (Tr. at 513-14.)  He also said
that a Latino or light-skinned black man was one of the men

6

who fired at Mr. Gonzaga. (Tr. at 518-32.)  He claimed not
to have seen a weapon or to have seen anyone else fire
shots. (Tr. at 531.)

In closing arguments, Petitioner's counsel advanced
the theory that Petitioner was not involved in the
shooting.  He stated, "Gonzaga pulled out a gun and started
shooting at a tall, thin, black male who returned fire
. . . [Petitioner] is not that tall, thin black male." (Tr.
at 655-56.)

## Request to Charge on Justification

At the close of the testimony, defense counsel
requested that the trial court instruct the jury on
justification.  The trial court refused on the basis that a
justification charge would be inconsistent with the
versions of events presented by both the prosecution and
the defense. (Tr. at 626-27.)  The defense renewed its
request for a justification charge after summation and
again after the court delivered its instructions to the
jury.  The trial court denied the application each time.
(Tr. at 711, 773.)

Instructions on the People's Burden

The trial court began its jury instructions by telling the jury that it was the exclusive trier of facts, it was required to decide the case on the evidence presented at trial, and that each juror could resolve any discrepancies in his or her recollection of the evidence by asking that testimony be re-read or by consulting fellow jurors. (Tr. at 712-15.)  The trial court explained that facts could be found in one of two ways:  either by accepting the evidence on its face or by drawing inferences from the evidence. (Tr. at 714.)  The trial court advised the jury that the Petitioner was "entitled to all the factual inferences in his favor which can be reasonably drawn from the evidence" and that if two inferences could be drawn, the Petitioner was "entitled to the inference of innocence." (Tr. at 715-16.)

The court also informed the jury that the elements of the crimes charged "have to be proven beyond a reasonable doubt." (Tr. at 716.)   The court advised the jurors:

> When a jury finds a fact, it has to be done
> fifty-one to forty-nine.  When a jury finds that
> the People have failed to or have met an element,
> that's beyond a reasonable doubt, that's where
> the standard beyond a reasonable doubt is
> applied.  It's on the elements, not on the
> individual factfinding, because in a case, it is
> a mosaic.  You figure out what pieces go into the
> puzzle.  It is the prosecution's obligation to

> put things in the case that you can use to decide
> whether a fact exists directly by inference is
> fifty-one/forty-nine [sic].  The elements,
> however, must be proven beyond a reasonable
> doubt.

(Tr. at 716-17.)

The trial court reminded the jury that it must

decide who to believe and that a single witness's

testimony could satisfy the People's burden of proof

beyond a reasonable doubt. (Tr. at 716, 720-21.)

Thereafter, the trial court described the People's

burden of proof in more detail.  The trial court emphasized

that the Petitioner was presumed innocent and that the

presumption of innocence remained until the jurors were

convinced that the proof established Petitioner's guilt of

one or more of the crimes charged beyond a reasonable

doubt. (Tr. at 721.)  The trial court reiterated that the

law "places [this] burden entirely on the People," where it

"remains continually and perpetually," and emphasized that

Petitioner bore no burden of proof and that "the fact that

he called a witness does not in any way shift the burden to

him." (Tr. at 722.)  The trial court then defined

"reasonable doubt" as,

> the standard American criminal law burden of
> proof that applies everywhere.  And, of course,
> as a definition, a reasonable doubt means a doubt
> based upon reason.  It is a doubt of the head and
> not the heart.  It is a doubt which remains after

discussing the case in the jury room.  It must, however, be a doubt based on the evidence or the absence of evidence in this case.  It is not a theoretical exercise that relates to what you're exposed to during the course of this trial.

A reasonable doubt means an actual doubt, a doubt you are conscious of having after reviewing in your mind all of the evidence and after giving careful consideration to all of it.  If at that time you feel uncertain or are not fully convinced that a defendant is guilty, and if you believe that a reasonable person hearing the same evidence would not convict, then that is a reasonable doubt and the defendant would be entitled to a verdict of not guilty accordingly.

On the other hand, this does not mean that a reasonable doubt may be based upon a feeling, a whim, a guess, surmise or speculation or conjecture, nor may it be considered a kind of fence or shield behind which a juror may seek to hide in order to avoid doing a painful or disagreeable duty.

Also, there is no obligation on the part of the People to establish the elements of a crime beyond all doubt, because that would be virtually impossible, given all the facts there are that relate to testimony and of human beings. However, the People's obligation is to prove the defendant's guilt beyond a reasonable doubt.

(Tr. at 722-23.)

The trial court then instructed the jurors on the concept of accessorial liability as described more fully below.  The trial court explained that in order to prove the accessorial liability, the People had to prove beyond a reasonable doubt that Petitioner was either a principal or an accessory. (Tr. at 725-30.)  The court emphasized that

10

the jury must unanimously agree as to which role, if any,
Petitioner played in the crimes charged. (Tr. at 740.)

After defining the concept of intent (Tr. at 731-32),
the trial court instructed the jurors on the elements of
the crimes charged, reminding them, once again, that
"[i]t's the People's obligation to prove each element
beyond a reasonable doubt." (Tr. at 733.)  The trial court
next discussed the charges that the jury had to consider
(Tr. at 734-52), stressing twelve times that the People had
to prove the various elements of those crimes beyond a
reasonable doubt (Tr. at 736-37, 740, 744, 747, 751-52).

The trial court advised the jury that the verdict on
each count could be different, stating once again that "the
People's obligation is to prove a crime charged beyond a
reasonable doubt.  If they do, you must convict.  If they
fail, you must acquit." (Tr. at 752.)  The trial court then
stated:

> When you get into the jury room, there's
> undoubtedly going to be things to talk about and
> there might even be things to argue about.
> That's been known to happen.  The pool from which
> the jurors come is the same pool from which the
> electorate comes.  And in elections, there are
> close counts.  In elections, fifty one beats
> forty-nine point nine every time, and even if the
> person is [a] loser, they're a winner and you're
> stuck with them for two or six years and the case
> of some judicial elections, fourteen years.
>   For over two hundred and thirty years, the
> same pool of people that has never elected

11

> anybody by acclimation [sic] has been deciding
> unanimously in criminal cases.  How does that
> happen?  It happens, obviously, because during
> the course of deliberations, people change their
> minds.

(Tr. at 752-53.)  The trial court then told the jurors how

they should attempt to resolve their differences and

reminded them that the verdict had "to be the individual

verdict of each of the twelve voting jurors." (Tr. at 753-

54.)

Sometime after the jury began its deliberations, it

sent a note to the trial court "ask[ing] for a statement of

how certain a juror must be of a finding of fact on which

guilt or innocence crucially depends." (Tr. at 788.)  The

trial court consulted with the People and Petitioner's

counsel and proposed to re-instruct the jury that "[a] fact

is fifty-one/forty-nine, the verdict and elements, has

[sic] to be beyond a reasonable doubt." (Tr. at 789.)  When

the court asked the parties for their positions,

Petitioner's counsel responded, "It's a fact, it's beyond a

reasonable doubt.  I don't think it's fifty-one/forty-

nine." (Tr. at 789.)  Counsel requested that the court

"charge them that the People must prove the charges beyond

a reasonable doubt proving any essential facts." (Tr. at

789-90.)

The trial court instructed the jury:

> Because the People must prove elements of a
> crime beyond a reasonable doubt, it follows that
> if a fact is crucial, to use your word, on guilt
> or non-guilt, then such a fact on which proof
> beyond a reasonable doubt hinges, would have to
> be established beyond a reasonable doubt before a
> juror could be satisfied that an element was
> proven to that standard.
>      Not every fact in a case must be proven
> beyond a reasonable doubt, but if a fact's
> existence is indeed critical or necessary to
> establish an element necessary for a guilty
> verdict, then that fact must be proven beyond a
> reasonable doubt.
>      Jurors may arrive at their individual
> verdicts differently, but if a fact's existence
> is so critical that no reasonable person could
> find guilt beyond a reasonable doubt without that
> fact, then it must be established beyond a
> reasonable doubt, for example, identity.

(Tr. at 792.)


### Accessorial Liability Instructions

As to the trial court's charge on the People's theory

of accessorial liability, the trial court stated that if

two or more people "are acting with a common purpose," and

if "any among them do an act which is designed to further

the common purpose," then all of those individuals could be

"found guilty," provided that they also "had the mental

element" required for the offense. (Tr. at 725-26.)   The

trial court explained that "[t]he law says that a person

can be criminally liable for the acts of another person,"

and under those circumstances "the acts of one are

attributable to the other so that even somebody who hasn't done one act during the course of this event can be liable." (Tr. at 726.)

The trial court then instructed the jurors that "for the People to rely on this in concert or joint responsibility theory," they had to prove "two things beyond a reasonable doubt"--that the principal had the "mental element" defined by the applicable criminal statue and that the "non-actor" had either "direct[ed] the other person to do an act" or "intentionally aid[ed] the other person by doing an act that somehow furthers the common purpose." (Tr. at 727-28.)

The trial court provided two hypothetical examples to illustrate the mutual-intent requirement.  The first involved a gunfight. (Tr. at 727.)  The trial court told the jurors that if two people intended to injure "the person at whom the gun is pointed," and if one "fired and missed" or did not even "have a gun," "the one who fired and missed or the one who threatened with a gun but didn't fire" would be just as guilty as the one who succeeded in shooting the victim, provided that "they had a common goal." (Tr. at 727.)  In the second hypothetical, the trial court described the burglary of a warehouse, where one person was the getaway driver, another helped carry away

14

the stolen property, and the third was the one who entered
the building.  The court told the jury, "[e]verybody knows
what's going on" when they "drive up to [the] warehouse."
Under those circumstances, said the trial court, "[a]ll
three of them are guilty of burglary"; the person who drove
the getaway car "is as guilty as if he or she went into"
the building or had "carried away the property." (Tr. at
727-28.)

     The trial court then told the jurors that, with
respect to the requirement that the "non-actor" "directed"
or "intentionally aided" the principal, "any act, however
big or small, however successful or unsuccessful," could be
used to prove that the two individuals had acted in
concert, provided that the act was "intentionally done" to
"further the common purpose" and that the individuals
"simultaneous[ly]" shared the "mental element" of the crime
charged. (Tr. at 728.)  The trial court cautioned the
jurors that merely being "present at a place . . . where a
crime takes place" would not support a finding of
accessorial liability if the "non-actor" did not possess
the requisite criminal intent. (Tr. at 729.)  Likewise, the
trial court explained, mere "know[ledge] that a crime is
going to happen" would be insufficient if the "non-actor"
lacked the requisite criminal intent--even if he did

"something that is not intended to further the common
purpose but somehow accidentally furthers the common
purpose." (Tr. at 729.)

Describing a hypothetical orchestra, the court stated
that the conductor who "participat[ed] throughout" and the
musicians who did "different things at different times" all
acted in concert. The trial court added that even the
musician who played for a "brief moment is as much a part
of the performance as anybody who's performed during the
event." (Tr. at 729-30.) The trial court also explained
that determining whether two or more people had acted in
concert did not require the jury to apportion liability:
"It's like pregnancy. You are either in it or not. . . .
[Y]ou are either a little involved or you're not involved.
You are either a lot involved or you're not involved.
Percentages don't matter." (Tr. at 730.) The trial court
also told the jurors that, to convict petitioner of
assault, they had to be in unanimous agreement that he
"fired" the gun, or acted in concert "with whoever the
shooter was." (Tr. at 740.) Petitioner did not object to
any part of these instructions. (See Tr. at 754-58.)

During the first day of its deliberations, the jury
sent a note asking for "[a] statement of the elements of a
crime carried out . . . 'in concert' . . . in particular,

16

the definition of an 'action' . . . by the defendant guilty
of acting in concert, even if he is not the shooter." (Tr.
at 773.)   When Petitioner's counsel asked the trial court
to deliver "the CJI on accessorial liability," the trial
court stated that the jurors "seem to want something on the
intent to assist part of the acting in concert concept."
(Tr. at 774.)  Because the jury appeared to be focusing on
the requirement that a non-actor "intentionally aid in some
way, however great or small," the trial court told the
parties that it would address that issue specifically and,
in addition, would reiterate the "mere presence" caution
that it had given in its final charge. (Tr. at 774.)

     The People suggested that the trial court "restate
what it had stated on [the] original charge" and, in
particular, that it repeat the orchestra "analogy." (Tr. at
774-75.)  The trial court responded that, because the
jurors had "use[d] the phrase 'non-shooter,'" it appeared
that they were "looking for a little bit more guidance"
about "what they [should] do in a multiple [actor]
situation where more than one person is mentally liable,
but not everybody is a shooter."  Thus, the trial court
resolved "to attempt to deal somewhat meaningfully with a
situation where a non-shooter acts." (Tr. at 775.)

The trial court proposed another hypothetical, where a person in one state solicits a person in another state to commit a murder. (Tr. at 776.)  The People objected to that example, on the ground that "this isn't a solicit or request case and . . . that analogy implies that it is." (Tr. at 776.)  Petitioner's counsel agreed and asked the trial court not to give additional hypothetical examples but, instead, to "give the current full CJI charge on accessorial liability," including the cautionary "mere presence" language. (Tr. at 777-78.)

The trial court told the parties that it was not "merely going to give [the jurors] a law," as that would not be a "meaningful" response to the jury's "fact specific" question about a person who "is guilty in concert, but who is a non-shooter." (Tr. at 778.) Petitioner's counsel repeated his objection to the use of "any examples," because "given the best view of the evidence from the perspective of the defense, [Ms. Lacayo's testimony] . . . didn't present any evidence of accessorial conduct on behalf of the second individual who is with the person who [Lacayo] said defensively shot Gonzaga." (Tr. at 779.)  The trial court rejected Petitioner's objection, noting that the jury was not asking about "a factless,

18

baseless hypothetical for their own curiosity." (Tr. at 779.)

When the jury returned to the courtroom, the trial court reiterated that to establish that Petitioner had acted "in concert" the People had to "prove two things beyond a reasonable doubt."  First, they had to prove that "each person," sharing a "common purpose," had the required "mental state," in this case, an intent to cause "serious physical injury or to kill a person." (Tr. at 780, 783.) Second, they had to prove that Petitioner "either did an act to further the common purpose, requested and directed another to do an act to further the common purpose, or intentionally aided another to further the common purpose." (Tr. at 781.)  The trial court then repeated its warning that neither "mere presence" at the scene nor mere "associat[ion]" with the other actors would suffice. (Tr. at 781-82.)

The trial court told the jurors that, although the People had to prove that Petitioner possessed the requisite intent and that he had carried out, requested, or "intentionally aided in any manner the commission of the charged crime," the People were not required to prove "the identity of a person with whom the petitioner may have acted in concert."  Nor did the People have to "prove how

many persons were in concert during the criminal transaction." (Tr. at 781-82.) The trial court also reminded the jurors that "[t]he degree or extent to which a person intentionally participates in the crime is immaterial," as the law does not require "the jury to determine whether one of a series of participants is more guilty than another." (Tr. at 782-83.)

The trial court then addressed the jury's "very specific question about what can a non-shooter do if he's guilty of in concert participation in a crime like this." (Tr. at 783.) The trial court described a hypothetical murder in a hallway, where one person, "peeking out" from behind a door, "sees the victim come [into] the hallway and says, 'He's here,'" and then "somebody else steps into the hallway and shoots him." The court told the jury that, under those circumstances, "the observer" acted "in concert" and could be convicted even though he was "not the shooter." (Tr. at 783.)

The trial court offered a second hypothetical involving a two-state murder. The trial court explained that if "a person in California wants somebody in New Hampshire killed and makes arrangements to pay the person in New Hampshire and pays the person, maybe even sends him the gun or money to buy a gun," a jury could find "that the

person who never leaves California, who never touches a
gun, who [n]ever fires a gun, who never sees the victim of
the shooting, is in concert with the shooter in New
Hampshire." (Tr. at 784.)  Again, the trial court cautioned
that "[m]ere presence doesn't count.  You have to do
something.  Having a common mental purpose." (Tr. at 784.)

    After the supplemental charge, Petitioner's counsel
repeated his objection to the trial court's examples.
Referring to the hallway example, he stated, "Just because
someone gives a glance, I don't think that's enough for
acting in concert. . . . [I]t has to be a glance that means
something." (Tr. at 784-85.)  The trial court responded
that the example made that clear but agreed to "say it
again." (Tr. at 786.)  The trial court then told the jury
that "an inadvertent act doesn't count."  The trial court
added that, although "[a] glance or a nod of the head"
intended to "communicate information that furthers the
common purpose" could support a finding of accessorial
liability, "an inadvertent twist or no[d] or a shake of the
head that's not done for [that] purpose" could not. (Tr. at
787.)  Petitioner's counsel made no further objections to
the court's hypothetical examples.

    On the third day of its deliberations, the jury sent a
note "request[ing] a statement explaining whether

21

accompanying a man to a confrontation, a man whom one knows
to be armed and that uses the weapon, is sufficient to
establish one's intent that the weapon be used for murder,
assault or any other unlawful purpose." (Tr. at 797.)
Petitioner's counsel asked the court to tell the jury that
"the direct response to the question is no," because
"accompanying someone who you know to be armed, unless you
have the intent to use that arm is insufficient." (Tr. at
800.)   The trial court stated that it appeared that the
jurors were "pre-supposing in their note, knowledge on the
part of an unarmed person" that "the unarmed person is
accompanying an armed person" to a "confrontation." (Tr. at
800.)  Because "they are positing that situation," the
court proposed to recharge them on the "tools" they could
use in determining "what somebody intends or knows," and
that they "could use certain facts such as the nature of
the weapon to decide what the intent is, if any, of the
person accompanying the armed person to a confrontation."
(Tr. at 800-01.)

        Petitioner's counsel then asked the court to remind
the jury that the unarmed man not only had to "share the
intent" but had to "intentionally aid" the shooter.  While
counsel acknowledged that the unarmed man "absolutely"
could be found guilty as an accomplice if he provided

assistance such as "being a target," a "distraction," or "a

pointer out,"  he also insisted that the court remind the

jury of the "intentional[] aid" requirement. (Tr. at 803.)

When the jurors returned to the courtroom, the court

instructed them as follows:

> You heard me say in the acting in concert
> explanation that mere presence is not sufficient,
> that the People have to prove beyond a reasonable
> doubt a mental element, intent, and the doing of
> something that assists.  Your word is
> "confrontation."  A confrontation with a weapon
> is unlawful.  If the weapon is a loaded firearm,
> the type of confrontation and the potential
> result becomes more defined.
> One who accompanies an armed man to a
> confrontation can be found by a jury, if it
> chooses to do so, guilty of being in concert with
> the one who physically possesses and then uses
> the pistol for any unlawful purpose that the user
> of the weapon employs during the confrontation.
> [The charge] on intent that I read on
> Tuesday, says that the jury, if it chooses to do
> so, if it makes sense in the context of whatever
> facts you folks are finding, the law on intent
> says in part, as I explained on Tuesday, that a
> jury can find that a person intends the normal,
> natural and logical consequences of what their
> [sic] actions are and what the actions are of
> those with whom they may be in concert.
> Intent, you know, is a secret operation of
> the mind and you can look to what somebody did
> before, during and after on what they intended.
> In the context of this kind of situation where
> you're analyzing the nature of the confrontation,
> the nature of the weapon possessed, only if you
> decide that a person's presence was for the
> purpose of in someway assisting can the person be
> found liable for in concert possession.
> But this is a unique situation where
> presence could be enough for the second element
> of the in concert, provided a jury beyond a
> reasonable doubt decided that the presence was

for some purpose to assist the goal, the common purpose. It's any purpose and any assistance, however great or small: being an alternate target; being a pointer out, as that example I gave you yesterday or the day before; being a distraction; anything. But it has to be done beyond a reasonable doubt, the presence of a non-armed person at a confrontation with weapons or has to be for purposes in some fashion, leading [sic]. It's up to you folks, that's why you are here.

(Tr. at 806-08.)

Petitioner's counsel objected to the above-quoted language, because it "precluded the idea that the person going to the confrontation with the gun was only bringing the gun for self-defense," and thus the jury would not be "allowed to consider the fact that it was not possession with intent to use unlawfully." (Tr. at 810.) The trial court overruled counsel's objection, reasoning that, because the jury's note was limited to a situation where the gunman goes to the confrontation "purposefully," there was "no justification defense permissible under that circumstance." (Tr. at 810-11.)

Subsequent History

Petitioner's conviction was affirmed by the Appellate Division on June 16, 2005. See People v. Jones, 797 N.Y.S.2d 63 (N.Y. App. Div. 2005). On January 11, 2002,

24

the Court of Appeals denied Petitioner's leave to appeal.
People v. Jones, 836 N.E.2d 1159 (2005).  On March 20,
2006, the Supreme Court of the United States denied
certiorari. Jones v. New York, 547 U.S. 1026 (2006)
(summary order).

On June 11, 2006, Petitioner filed a motion pursuant
to New York Criminal Procedure Law ("CPL") § 440.10 with
the trial court seeking to vacate the judgment of
conviction.  In that motion, Petitioner argued that his
trial counsel was ineffective because he failed (1) to
request that the prosecutor deliver a justification charge
to the grand jury, (2) to impeach the victim with a prior
statement contained in a police report, and (3) to request
a jury instruction based on CPL § 60.22 that the defendant
could not be convicted upon the uncorroborated testimony of
an accomplice.  On September 28, 2006, the trial court
denied the motion on the grounds that counsel was not
ineffective for failing to request that the jury be charged
pursuant to CPL § 60.22 because "[n]o reasonable view of
the evidence supports the conclusion that the [ ] victim
was an accomplice" of Petitioner, Petitioner's testimony to
the grand jury obviated the need for a justification charge
being given to the grand jury, and counsel's failure to use
the police report to impeach Mr. Gonzaga was not

ineffective because the individual giving the report admitted that she was not "really sure" of what had been said and because the statement was not in fact inconsistent with Mr. Gonzaga's testimony nor with the Petitioner's guilt. (Decision on Motion to Vacate Judgment ("440.10 Decision"), attached as Ex. J to Danzig Decl. in Opposition to the Petition.)  On February 7, 2007, the Appellate Division denied the petitioner's application for leave to appeal the 440.10 Decision. People v. Jones, M-6217, 2007 N.Y. App. Div. LEXIS 1823 (N.Y. Supp. Feb. 7, 2007).

On July 23, 2007, Petitioner applied to this Court for a writ of habeas corpus.


II. DISCUSSION

A.  AEDPA Standard

"Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1), a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Knowles v. Mirzayance, -- U.S. --, 129 S. Ct. 1411, 1419 (2009) (quoting § 2254(d)(1)). Accordingly, a federal habeas court's initial task is to

identify what "clearly established Federal law" a habeas
petitioner contends a state court controverted or
misapplied.  That task necessarily involves habeas courts'
essential Article III functions: saying what the law is.
See Williams v. Taylor, 529 U.S. 362, 411 (2000).

In making such a determination, a federal habeas court
is limited to determinations made "by the Supreme Court of
the United States" only. 28 U.S.C. § 2254(d)(1) (emphasis
added); see also Williams, 529 U.S. at 412 ("[Section]
2254(d)(1) restricts the source of clearly established law
to this Court's jurisprudence."); Rodriguez v. Miller, 537
F.3d 102, 109 (2d Cir. 2008) ("AEDPA itself tells us that
the decisions of the courts of appeals cannot provide
clearly established federal law.").  "[T]he holdings, as
opposed to the dicta, of [the Supreme] Court's decisions as
of the time of the relevant state-court decision" need only
be considered. Williams, 529 U.S. at 412; Carey v.
Musladin, 549 U.S. 70, 74, 77 (2006); see also Teague v.
Lane, 489 U.S. 288, 308-310 (1989); Rodriguez, 537 F.3d at
106-07.

Once the federal habeas court determines the
applicable governing legal principles--that is, the legal
principles constituting clearly established Federal law, as
determined by the Supreme Court of the United States--it

must then consider whether the outcome of the habeas
petitioner's state court adjudication was contrary to or
involved an unreasonable application of those principles.
Pursuant to the "contrary to" clause of § 2254(d)(1), a
federal habeas court may grant the writ "if the state court
arrives at a conclusion opposite to that reached by [the
Supreme Court] on a question of law or if the state court
decides a case differently than [the Supreme Court] has on
a set of materially indistinguishable facts." Williams, 529
U.S. at 412-13.  Under the "unreasonable application"
clause of § 2254(d)(1), "a federal habeas court may grant
the writ if the state court identifies the correct
governing legal principle from [the Supreme] Court's
decisions but unreasonably applies that principle to the
facts of the prisoner's case." Id. at 413.  "The question
'is not whether a federal court believes the state court's
determination' . . . 'was incorrect but whether that
determination was unreasonable--a substantially higher
threshold.'" Knowles, -- U.S. --, 129 S. Ct. at 1420
(quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007))
(emphasis added).  Finally, "evaluating whether a [state
court's federal law] rule application was unreasonable
requires considering the rule's specificity.  The more
general the rule, the more leeway [state] courts have in

reaching outcomes in case-by-case determinations."

Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).[1]

## B. Petitioner's Arguments for Collateral Relief

The Petitioner argues that he is entitled to habeas

relief because the state court decisions[2] unreasonably

applied[3] clearly established federal law when they found no

error in the trial court's (1) jury instruction on the

People's burden of proof; (2) jury instructions on

accessorial liability; (3) refusal to deliver a jury charge

on justification; and (4) denial of Petitioner's claim of

ineffective assistance of counsel in the 440.10 Decision.

---

[1] The Report does not articulate or apply the correct AEDPA
standard, in that the grounds on which the Report
recommends granting Petitioner habeas relief are based on
Court of Appeals holdings and, in some cases, even New York
State Court holdings. See Report at 28-33. While certainly
helpful for determining the contours of clearly established
federal law, such holdings do not constitute clearly
established federal law for § 2254(d)(1) purposes.

[2] Petitioner does not identify which state court decision he
contends was contrary to or unreasonably applied clearly
established federal law. Petitioner seems to contest the
Appellate Division's decision affirming his conviction. In
any event, because all the state court decisions ultimately
reached consistent results, this Court construes the
Petition broadly and considers Petitioner to lodge an
attack on the general findings of all the state court
decisions.

[3] This Court does not understand the Petitioner to argue
that the state court decisions were contrary to clearly
established federal law. Nor does the Report so find.

(See Habeas Petition ¶ 13.)  Primarily, Petitioner contends
that those four issues constituted unreasonable
applications of due process principles.[4]

i.  Reasonable Doubt Charge

Petitioner contends that the state court decisions
affirming the trial court's inclusion of the "two-
inference" instruction and reference to the preponderance
of the evidence standard for fact-finding in the jury
charge were unreasonable applications of due process
principles.  However, no clearly established due process
rule, as determined by the Supreme Court, proscribes such
references in jury charges.

In In re Winship, 397 U.S. 358, 364 (1970), the
Supreme Court stated the now well-established rule that the
Due Process Clause of the Fourteenth Amendment "protects
the accused against conviction except upon proof beyond a
reasonable doubt of every fact necessary to constitute the
crime with which he is charged."  The rule "symbolizes the
significance that our society attaches to the criminal

_____

[4] The Petition does not articulate precise legal grounds
upon which Petitioner contends he is entitled to the Writ.
The Court has construed Petitioner's arguments in the light
most favorable to Petitioner--as did the Report--while
taking into account the AEDPA standard by which his
arguments must be considered.

sanction and thus to liberty itself."  Jackson v. Virginia,
443 U.S. 307, 315 (1979).  The reasonable doubt standard
"provides concrete substance for the presumption of
innocence--that bedrock axiomatic and elementary principle
whose enforcement lies at the foundation of the
administration of our criminal law."  Winship, 397 U.S. at
363 (internal quotation marks omitted).

However, due process does not require that a uniform
articulation of the reasonable doubt standard be given in a
jury charge in every case.  The Supreme Court's teachings
on this point are clear:

> The beyond a reasonable doubt standard is a
> requirement of due process, but the Constitution
> neither prohibits trial courts from defining
> reasonable doubt nor requires them to do so as a
> matter of course.  Cf. Hopt v. Utah, 120 U.S. 430,
> 440-441 (1887).  Indeed, so long as the court
> instructs the jury on the necessity that the
> defendant's guilt be proved beyond a reasonable
> doubt, see Jackson v. Virginia, 443 U.S. 307,
> 320, n. 14 (1979), the Constitution does not
> require that any particular form of words be used
> in advising the jury of the government's burden
> of proof.  Cf. Taylor v. Kentucky, 436 U.S. 478,
> 485-486 (1978).  Rather, "taken as a whole, the
> instructions [must] correctly conve[y] the
> concept of reasonable doubt to the jury."  Holland
> v. United States, 348 U.S. 121, 140 (1954).

Victor v. Nebraska, 511 U.S. 1, 5 (1994).  And in Estelle
v. McGuire, 502 U.S. 62, 72-73 & n.4 (1991), the Supreme
Court reaffirming that the single standard for reviewing

31

the constitutionality of jury instructions is whether a particular instruction created a "reasonable likelihood" that the jury misapplied the People's burden. See also Boyde v. California, 494 U.S. 370, 378-80 (1990).

No Supreme Court decision has considered whether "two-inferences" charges or, for that matter, instructions to a jury that it may apply the preponderance of the evidence standard to factfinding, comport with due process.  Thus, Petitioner has a particularly difficult task in arguing that the state court decisions unreasonably applied due process principles in this case. See Yarborough, 541 U.S. at 664 ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

Of Supreme Court decisions that have considered whether particular reasonable doubt instructions comported with due process, cf. Cage v. Louisiana, 498 U.S. 39, 41 (1990) (per curiam), no decision provides a holding even remotely similar to the type of charge given by the trial court in this case.  The Report suggests that some federal courts have held that "two inference" instructions violate due process. See Report at 22.  While that may be so, the Supreme Court of the United States has never considered the issue, and the Court's more general pronouncements on the

constitutionality of charge wording emphasize that
alternative iterations of the reasonable doubt standard are
permitted. See Victor, 511 U.S. at 20 (favoring "an
alternative definition of reasonable doubt").   Thus, there
is simply no clearly established federal law, other than
general due process principles, which Petitioner may
complain was unreasonably applied by the state courts.[5]

As to general due process principles, this Court
concludes that the state court decisions affirming the
constitutionality of the trial court's jury instructions on
the People's burden were not unreasonable applications.   As
noted above, the trial court's jury instructions repeatedly
emphasized that the People must prove all elements of the
charges beyond a reasonable doubt. (Tr. at 716-17, 720-23,
725, 733-37, 740, 744, 747, 751-52, 792.)   This Court finds
that the numerous iterations of the reasonable doubt
standard, not to mention the detailed definition provided
(Tr. at 722-23), constituted helpful guidance to the jury

---

[5] The Court of Appeals certainly does not consider two-
inferences charges and preponderance of the evidence
factfinding to be unconstitutional. See United States v.
Delibac, 925 F.2d 610, 614 (2d Cir. 1991); United States v.
Khan, 821 F.2d 90, 92 (2d Cir. 1987); United States v.
Gatzonis, 805 F.2d 72 (2d Cir. 1986); United States v.
Viafara-Rodriguez, 729 F.2d 912, 913 (2d Cir. 1984); see
also Brown v. Greene, -- F.3d --, 2009 WL 2445401, at **3-4
(2d Cir. Aug. 11, 2009) (discussing the Court of Appeals'
consideration of this issue in the context of an
ineffective assistance of counsel claim).

and correctly articulated the state of the law.  Thus, the
state court decisions upholding the jury instructions were
well within the bounds of reasonable applications of--and
certainly were not contrary to--clearly established federal
law as determined by the Supreme Court of the United
States.

## ii.  Accessorial Liability Charge

Petitioner contends that the state court decisions
unreasonably applied clearly established due process
standards when they upheld the trial court's instruction to
the jury by way of five hypothetical examples to illustrate
the People's accessorial liability theory.  However,
Petitioner's argument is amorphous and cannot be tethered
to any specific due process rule proscribing or defining
the limits to which hypothetical examples may be used in
jury instructions. (Petition at ¶ 13.)  The Report notes
that hypothetical explanations are disfavored, though not
unconstitutional, and concludes that the trial court's
charge "created at least a reasonable likelihood that the
jury applied the challenged instructions in a way that
violates the Constitution." (Report at 47.)

The Report--and Petitioner, this Court must assume--
rely on Estelle, 502 U.S. at 72, which considered whether a

34

jury instruction on the role of prior bad act evidence so infected the entire trial that the resulting conviction violated the defendant's due process rights. (Report at 47.) As an initial matter, Estelle found that the jury instruction in that case did not violate due process. Thus, it does not provide a particularly helpful guidepost by which to judge unconstitutional jury instructions. It does not allow this Court to analogize the instructions in this case with an instruction found to violate due process. Instead, and more importantly, Estelle teaches that for an instruction to violate due process, it must be more than undesirable, erroneous, or even universally condemned. Id. at 72. Due Process requires fundamentally fair jury instructions, but the category of infractions that violate the fundamental fairness test is extremely limited. Id. at 73 (citing Dowling v. United States, 493 U.S. 342, 352 (1990)). Finally, as noted above, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Id. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The cases cited in the Report do not

constitute clearly established federal law as determined by
the Supreme Court.[6]

Judged according to the Estelle teachings,
Petitioner's argument that the state court decisions
upholding the trial court's instruction on accessorial
liability were unreasonable applications of clearly
established federal law undoubtedly fails. The jury
instructions describing the New York State law on
accessorial liability were correct. (See Tr. at 726-29;
780-84; 806-08; see also Report at 39, 42 (conceding the
instructions were correct).) Also, the instructions were
not conflicting--not that incorrect or conflicting
instructions on state law would necessarily warrant
granting a writ of habeas, Estelle, 502 U.S. at 71-72, but

_____

[6] United States v. Dove, 916 F.2d 41, 46 (2d Cir. 1990),
found that certain jury instructions or the lack thereof
made the charge "unbalanced" and "prejudicial," but Dove
did not articulate a constitutional standard by which it
judged the instructions. The Dove court certainly was not
applying a clearly established federal law standard for
judging violations of due process, as determined by the
Supreme Court, as the Court must in this case. Thus, Dove
is unhelpful. As are United States v. Salameh, 152 F.3d 88,
143 (2d Cir. 1998); United States v. Gaggi, 811 F.2d 47, 62
(2d Cir. 1987); United States v. Gleason; 616 F.2d 2, 14
(2d Cir. 1979); and United States v. Dizdar, 581 F.2d 1031,
1037 (2d Cir. 1978). None of those cases involved a
procedural posture involving habeas review of a state court
decision. Thus, it cannot be said that those decisions
looked only to clearly established federal law, as
determined by the Supreme Court, to consider whether the
particular jury instructions violated due process.

36

at least those facts would tend to strengthen Petitioner's claim of jury confusion and thus unfairness.

Nor for that matter did the inclusion of the hypothetical examples produce a reasonably likelihood that the jury misapplied state law. While the jury obviously had some confusion on the precise contours of the accessorial liability theory, as evidenced by the two questions submitted by the jury during their deliberation, this Court finds nothing particularly extraordinary or unbalanced about the trial court's explanations by way of example. This Court cannot help but conclude that the jury correctly applied the law because the trial court's explanation of the law, taken in its entirety, was correct. See Richardson v. Marsh, 481 U.S. 200, 211 (1987) (emphasizing the rule that juries are presumed to follow their instructions).[7]

---

[7] Relying primarily on Second Circuit and Southern District of New York cases, (e.g., Report at 36-41), the Report concludes that the trial court's hypothetical examples created a reasonable likelihood that the jury misapplied the law. This Court disagrees with that conclusion. The examples were reasonable attempts to explain the concept of acting in concert liability.

The first three hypothetical examples--describing a gunfight, a warehouse burglary, and an orchestra-- exemplified the state of mind and types of conduct sufficient to satisfy the accessorial liability theory. The examples were concededly accurate illustrations of N.Y. Penal Law § 20.00 and were not objected to during the trial. (See T. 754-58.) (continued . . .)

As such, this Court simply cannot find any clearly established federal law which was unreasonably applied when the state court decisions upheld the trial court's instructions by way of five hypothetical examples.

### iii. Non-delivery of the Justification Charge

Petitioner next contends that the state courts unreasonably applied clearly established federal law when they upheld the trial court's refusal to deliver a

---

(. . . *continued*) The two hypothetical examples offered in response to the jury questions--describing a hallway murder and a two-state murder--although objected to, were not unfair, unbalanced, or particularly capable of producing a likelihood that the jury would misapply the law. Particularly in light of Petitioner's complaint that the first example gave the jury the wrong impression that a mere "glance" is "enough for acting in concert" (Tr. at 784-85), the trial court instructed the jurors--as it did before Petitioner asserted his objection--that simply being present, or being present and acting inadvertently, is insufficient. The trial court emphasized that the glance or nod must be done for the purpose of "communicat[ing] information that furthers the common purpose," (Tr. at 786-87), and "mere presence is not sufficient, that the People have to prove beyond a reasonable doubt a mental element, intent, and the doing of something that assists," (Tr. at 806-08). Whether or not "[t]he wiser course at that juncture would have been to merely repeat the law on accomplice liability," (Report at 42), these explanations were neutral and balanced and, most importantly, constituted alternative iterations of the state law. Considering all of the trial court's instructions on accessorial liability as a whole, this Court concludes that they accurately conveyed New York's law on accessorial liability and produced no likelihood that the jury would misapply that law.

38

justification jury instruction.  Petitioner contends, and
the Report concludes, that the state court decisions
unreasonably applied due process standards when upholding
the district court's refusal.  The Report concludes that
the refusal "so infected the entire trial that the
resulting conviction violates due process." (Report at 47
(citing Henderson v. Kibbe, 431 U.S. 145, 154-55 (1977).)

     In regards to a refusal to charge argument, the Court
of Appeals has determined a habeas petition under 28 U.S.C.
§ 2254 is warranted only if a petitioner shows (1) that he
was "entitled to a justification charge" under New York
law, (2) that the failure to give the charge resulted in a
denial of due process, and (3) that the relevant reviewing
state court's contrary conclusion constituted an
unreasonable application of clearly established federal
law, as determined by the Supreme Court. Jackson v.
Edwards, 404 F.3d 612, 621 (2d Cir. 2005) (citing Davis v.
Strack, 270 F.3d 111, 124 (2d Cir. 2001)).  The Report
answers each of those questions in the affirmative.  This
Court disagrees as to the first requirement and,
accordingly, determines that the trial court, and the state
court decisions upholding the trial court's refusal, did
not violate clearly established federal law.

Petitioner was not entitled to a justification charge under New York law.  In New York, a person is justified in using "deadly physical force" against another when he "reasonably believes that such other person is using or about to use deadly physical force." N.Y. Penal Law § 35.15(2)(a).  Even under those circumstances, a person may not use deadly physical force (with certain exceptions not relevant here) "if he or she knows that with complete personal safety, to oneself and others[,] he or she may avoid the necessity of so doing by retreating." Id.; see also People v. Goetz, 68 N.Y.2d 96, 106 (1986).  In determining whether a justification charge is warranted, the trial court must assess the evidence in the light most favorable to the defendant. Blazic v. Henderson, 900 F.2d 534, 540 (2d Cir. 1990) (citing cases from the New York Court of Appeals).  And a defendant has a right to assert inconsistent defense theories. See People v. Steele, 26 N.Y.2d 526, 529 (1970); see also Mathews v. United States, 485 U.S. 58, 63-64 (1988).  Nonetheless, "there must exist a reasonable view of the evidence from which a jury could conclude that the defendant's acts were justified.  [The] court is not required to adopt an artificial or irrational view of the evidence in deciding whether a justification

charge is warranted." Blazic, 900 F.2d at 540 (citing

People v. Butts, 72 N.Y.2d 746, 750 (1988)).

No reasonable view of the People's evidence, viewed in

the light most favorable to Petitioner, permitted the jury

to conclude that Petitioner's acts were justified.  Mr.

Gonzaga testified that when he was confronted by Petitioner

and his companions, he (Gonzaga) was unarmed and posed no

threat to anyone. (Tr. at 330, 338, 381.)  Furthermore, Mr.

Gonzaga testified that it took only one or two seconds for

Petitioner to draw his gun and start firing. (Tr. at 338.)

And, although Mr. Leslie did not witness the shooting, he,

too, testified that Gonzaga was unarmed at the time. (Tr.

at 393, 397.)  Mr. Gonzaga and Mr. Leslie's testimony was

corroborated by the fact that no weapon was recovered from

or near Mr. Gonzaga as he lay wounded on the ground. (Tr.

at 482-86.)  Even Petitioner, in his Grand Jury testimony,

never claimed that Mr. Gonzaga was armed or had threatened

anyone. (See Tr. at 509, 513-20, 523-24, 527, 532-36.)

Similarly, the evidence adduced at trial by

Petitioner, even if it were the only evidence credited by

the jury, would not have permitted the jury to conclude

that Petitioner's acts were justified.  Petitioner's sole

witness, Ms. Lacayo, testified that the shooting involved

only three men:  two black men who were walking together on

First Avenue, and a Latino man who was walking alone across
112th Street. (Tr. at 554-56, 558-59, 563-64, 566, 591,
593.)   Although Ms. Lacayo testified that the Latino man
drew his gun before one of the black men did (Tr. at 556,
567), she later testified that the two men drew their guns
simultaneously, (Tr. at 593).  Ms. Lacayo was unable to
identify petitioner at trial, (Tr. at 589), and her
testimony that both black men were tall, (Tr. at 559),
would seem to rule out Petitioner, who is apparently only
five feet, three inches tall (See Pet. App. Br. at 10; see
also Report at 4 n.5.).  Petitioner's own counsel
emphasized this point in his closing arguments, asking
Petitioner to stand up for the jury to see his size, thus
ruling out the possibility that Petitioner could have been
the black man shooter. (Tr. at 655-56.)[8]  The jury could not
reasonably have concluded that Petitioner was the black man
who drew his gun after or at the same time that the Latino
man drew his.[9]  Accordingly, Petitioner was not entitled to
a justification charge under New York Law.

---

[8] This Court notes that Petitioner advanced this same
argument in his appellate brief. See Danzig Decl., Ex. A
(Pet. App. Br. at 16) ("Lacayo observe[d] that all three
men on the corner were tall (TR.599) — which [petitioner]
is not.").

[9] Ms. Lacayo's testimony was meant to show that Petitioner
was not even present at the scene of  (continued . . .)

Because Petitioner was not entitled to a justification charge under New York law, the trial court's refusal to deliver such a charge did not violate Petitioner's right to due process, and it was certainly not an unreasonable application of due process for the state courts to uphold the decision.  "[D]ue process does not require the giving of a jury instruction when such charge is not supported by the evidence." Blazic, 900 F.2d at 541 (citing Hopper v. Evans, 456 U.S. 605, 611 (1982)).

### iv.  Effective Assistance of Counsel

Finally, Petitioner contends that the trial court unreasonably applied clearly established federal law when it determined, in the context of the § 440.10 Decision, that Petitioner was not denied effective assistance of counsel.  I agree with the Report's rejection of this theory and, in accordance with the reasons set forth therein, I conclude that the § 440.10 Decision was not an unreasonable application of clearly established federal law.

---

(. . . continued) the shooting.  That Lacayo failed to persuade the jurors of the validity of that theory, however, does not mean that she persuaded them that Petitioner was the black man shooter.  In any event, the jury certainly discredited her testimony in light of the conviction it returned.

III. <u>CONCLUSION</u>

For the reasons set forth herein, the Petition for Habeas Corpus pursuant to 28 U.S.C. § 2254 is DENIED.  A certificate of appealability will issue because "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner." <u>See</u> <u>Slack v. McDaniel</u>, 529 U.S. 473, 475 (2000). The Clerk of Court shall mark this action closed and all pending motions denied as moot.


Dated:    New York, New York
          August 25, 2009


_Loretta A. Preska_

Loretta A. Preska, U.S.D.J.

44